*CJP Supp. 263 Opinion
PICHON, Chairperson.
This disciplinary matter concerns Judge Bruce Van Voorhis, a judge of the Contra Costa County Superior Court. The notice of formal proceedings charged Judge Van Voorhis with 11 incidents of unethical conduct.
The commission agrees with the special masters that all 11 charges are supported by clear and convincing evidence. The commission concludes that four of Judge Van Voorhis’s acts constitute willful misconduct, that the remaining seven constitute acts of conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and that these proven charges constitute a pattern of misconduct similar in nature to the misconduct for which Judge Van Voorhis was previously publicly reproved. Judge Van Voorhis’s misconduct not only brought the judicial office into disrepute, but threatened to interfere with the actual administration of justice. Furthermore, the commission finds that Judge Van Voorhis does not appreciate the inappropriateness of his conduct and the commission concludes that Judge Van Voorhis would again violate the California Code of Judicial Ethics, if allowed to remain on the bench. For the reasons more fully set forth in this decision, the commission hereby removes Judge Bruce Van Voorhis from the bench.
PROCEDURAL HISTORY
Judge Van Voorhis was elected as a judge of the Contra Costa County Municipal Court and took office on January 5, 1987. On September 8, 1992, the commission publicly reproved Judge Van Voorhis for a number of instances of misconduct including ex parte communications, improper questioning of potential jurors, interrupting the proceedings in an adjoining courtroom, and giving directions to staff in a manner which was perceived as harsh. On February 1, 1994, the commission privately admonished Judge Van Voorhis for issuing subpoenas in his own dissolution case.
Judge Van Voorhis was elevated to the Contra Costa County Superior Court on June 8, 1998, as a result of the consolidation of the courts.
In May 2001, the commission sent a preliminary investigation letter to Judge Van Voorhis. Following his response, a notice of formal proceedings was filed on December 17, 2001. Judge Van Voorhis filed his verified answer on January 2, 2002.
On January 25, 2002, the Supreme Court, in response to the commission’s request, appointed three special masters. An evidentiary hearing was held from March 24 through March 27, 2002, in San Francisco, California, before *CJP Supp. 264 the special masters: Justice Thomas Hollenhorst of the Court of Appeal, Fourth Appellate District, presiding; Justice Kenneth Yegan of the Court of Appeal, Second Appellate District; and Judge Thompson Hanks of the Superior Court of Riverside County. Mr. Jack Coyle and Mr. Brad Battson of the commission’s office of trial counsel presented the case in support of the charges. Judge Van Voorhis was represented by Mr. James A. Murphy and Mr. Harlan B. Watkins of Murphy, Pearson, Bradley & Feeney of San Francisco, California. On September 6, 2002, the masters submitted their 64-page report to the commission.
Following the receipt of objections and briefs from Judge Van Voorhis and the office of trial counsel, the matter was argued before the commission on December 4, 2002. Mr. Coyle presented argument on behalf of trial counsel. Judge Van Voorhis spoke in his own behalf and was represented by Mr. Murphy.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
A. Count One
1. Findings of Fact
Judge Van Voorhis presided over a jury trial in People v. Elze in Walnut Creek from January 30 to February 1, 2001. Mr. Elze was charged with driving under the influence of alcohol. Deputy District Attorney Stacey Brock prosecuted the case and Timothy Gomes, a private attorney, was defense counsel. At the time of the trial, Ms. Brock had been an attorney for approximately three months.
One of the issues in the case concerned statements that Mr. Elze had made to the police. Police officers in a marked patrol car were driving behind Mr. Elze on an on-ramp to a major highway. Mr. Elze stopped very abruptly, and the officers had to slam on their brakes to avoid rear-ending him. The officers found this to be unusual. They followed Mr. Elze for a while and he was driving slowly. They then put on their lights and siren to pull Mr. Elze over. He was very slow to pull over. The officer approached Mr. Elze on the right side to avoid traffic, and asked him some questions such as why he braked so abruptly. The officer smelled alcohol and asked Mr. Elze whether he had been drinking. The questions were asked before the field sobriety tests were administered and while Mr. Elze was still in his car.
Attorney Gomes filed a written motion in limine to exclude Mr. Elze’s statements on the theory that they were elicited in violation of Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], Although the *CJP Supp. 265 written motion sought to exclude all statements made from the time of Mr. Elze’s “detainment,” the pretrial oral argument focused on the admissibility of the pre-field-sobriety-test statements. Ms. Brock sought to introduce these statements. Judge Van Voorhis ruled that the pre-field-sobriety-test statements could not be introduced and warned Ms. Brock that introduction of the statements could lead to reversal, but noted that she could use the statements for impeachment should the defendant testify. Ms. Brock did not introduce the statements, but they were admitted during Mr. Elze’s questioning by his own counsel.[1] Mr. Elze was convicted.
After sentencing, Judge Van Voorhis remained on the bench and gave Ms. Brock an assessment of her performance. He told her that she had done well during the trial, but he also told her that as a young lawyer, she had to be prepared for an unanticipated ruling by a judge and that she needed to be able to adjust her strategy of attack. Ms. Brock and two other district attorneys, who were present in the courtroom, testified that Judge Van Voorhis stated that he knew that Mr. Elze’s statements were admissible, but that he kept them out to see how Ms. Brock would handle herself. Judge Van Voorhis testified that his statements were taken out of context and denied that he intentionally made a wrong ruling in order to see how Ms. Brock would react.
The masters, having weighed the evidence of all the witnesses, credited the testimony of the district attorneys and found that Judge Van Voorhis, by his comments, gave the appearance of having decided a legal issue to teach a new lawyer how to handle adversity. The masters, however, also found that “[g]iven the poor quality of the briefing by opposing counsel, the poor quality of the record which was not developed in a pretrial evidentiary hearing, and the lack of any intelligent analysis by the parties or Judge Van Voorhis, we cannot find, as of the time of the ruling, he deliberately made an erroneous ruling.”
The commission adopts the masters’ finding that Judge Van Voorhis by his comments gave the appearance of having decided a legal issue to teach a new lawyer how to handle adversity. The commission notes that even at the evidentiary hearing before the masters, Judge Van Voorhis failed to appreciate how his choice of topics, “unexpected results,” implicitly suggested that his ruling was questionable, if not wrong. In addition, he testified before the masters: “The other two walked in the room, and I started talking to her about how unexpected results can happen in a trial. And you know, I expressed to *CJP Supp. 266 her that—and I can’t remember the exact words. But on the face of it, she should have expected a victory and that I knew that, in a case of detained motorist, you’re not entitled to Miranda warnings and any of the admissions that you make are admissible but that she failed to consider the unexpected result and instead, you know, decided to pursue on this battlefield.” This statement by Judge Van Voorhis, like his statement to Ms. Brock, gives the clear appearance that he knew that the defendant’s statement was admissible.
2. Conclusions of Law
Prejudicial conduct is “ ' “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.” ’ ”[2] “The provision that the conduct must be that which ‘brings the judicial office into disrepute’ does not require actual notoriety, but only that the conduct, if known to an objective observer, would appear to be prejudicial to public esteem for the judicial office.”[3]
The “public esteem for the judicial office” aspect of prejudicial misconduct is measured by an “objective observer” standard. This aspect is established when it would appear to an “objective observer” familiar with the facts and the standards of conduct that the conduct in question is prejudicial to public esteem for the judicial office.[4] The views of actual observers are sufficient, but not necessary, to establish judicial misconduct under an objective observer standard.[5] The judge’s intent or motivation “is not a significant factor in assessing whether prejudicial conduct has occurred under this standard.”[6]
The commission concludes that Judge Van Voorhis’s comments in court after the sentencing violated canons 1 and 2A of the California Code of Judicial Ethics (all references to a canon are to the California Code of Judicial Ethics) and constituted conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Judge Van Voorhis, by commenting to the prosecutor on her reaction to his questionable ruling to *CJP Supp. 267 exclude Mr. Elze’s pre-field-sobriety-test statements,[7] violated canon 1 by failing to observe “high standards of conduct ... so that the integrity and independence of the judiciary will be preserved.” The judge also violated canon 2A by failing to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary. As noted by the masters, to the “objective observer,” Judge Van Voorhis’s statement “that he made a ruling for the purpose of seeing how the prosecutor would handle it, was prejudicial to public esteem for the judicial office.”
B. Count Two A(l)
1. Findings of Fact
Judge Van Voorhis presided over People v. Silva, a criminal case tried before a jury on June 1 and 2, 1999. Ms. Silva was charged with possession of methamphetamine with intent to sell. The prosecutor was Deputy District Attorney Dana Filkowski and Ms. Silva was represented by William Gardner, a private attorney. The masters found that Mr. Gardner was physically unkempt and did not appear ready for trial. He had no paper on which to take notes during the trial and had to borrow a tablet from the prosecutor.
During the course of trial, Mr. Gardner attempted to present a third party culpability defense based on the arrest of another person the day before the search warrant was executed at Ms. Silva’s residence. Mr. Gardner, however, had no witnesses or admissible evidence to present on the issue of third party culpability.
A discussion ensued between Judge Van Voorhis and Mr. Gardner in front of the jury. In a dialogue that extended for 13 pages of transcript, Judge Van Voorhis became increasingly exasperated by counsel’s ineptness. The prosecutor serially objected to questions poorly framed by defense counsel. The judge was critical of Mr. Gardner’s questions, Mr. Gardner appeared to be confused, and Judge Van Voorhis became increasingly aggressive toward Mr. Gardner. When it became clear that the jury seemed more interested in the exchange between the court and Mr. Gardner, the prosecutor asked the *CJP Supp. 268 court to complete the discussion outside the presence of the jury. Judge Van Voorhis responded, “That won’t be necessary.”
The masters noted that “[d]uring this exchange, the judge interjected a lengthy series of questions and comments about Mr. Gardner’s cross-examination that disparaged his professional competence. The prosecutor saw that the judge was making Mr. Gardner look ‘somewhat pathetic’ and became concerned that the jury might take pity on Mr. Gardner. Partly for that reason, the prosecutor stated, ‘Your Honor, please. May we do this outside the presence of the jury?’ ”
Judge Van Voorhis ignored the prosecutor’s request and continued to disparage Mr. Gardner.[8] The masters found that Judge Van Voorhis raised his voice and his tone was condescending, disrespectful and contemptuous. They noted that when “the judge made his statements about law school, his eyes got very wide, he leaned forward in his chair, and gestured with his hand adding to the aggressiveness of the encounter.”
The exchange took place in front of the jury with the risk of having the jury decide the case based on nonevidentiary reasons. The masters noted “that even when the judge’s attention was drawn to the fact that [the] jury was listening to offers of proof and witnessing repeated hostility toward defense counsel, the judge refused to continue the discussions at sidebar thus ignoring the prejudicial effect of his conduct.” Judge Van Voorhis’s explanation for not excusing the jury was that “they would attach significance to what they weren’t hearing as much as they would attach to what they were and . . . start speculating about what they did and didn’t hear.” The masters noted that the judge admitted that his approach “ ‘enabled the defense attorney to place in front of the jury inadmissible evidence,’ and that ‘a skillful judge would have called a recess.’ ” The commission adopts the masters’ findings of fact on count two A(l).
2. Conclusions of Law
The masters concluded and the commission agrees that Judge Van Voorhis’s comments to Mr. Gardner constitute prejudicial misconduct. It would have appeared to an “objective observer” familiar with the facts and the standards of conduct that the judge’s comments to Mr. Gardner about his law school education were prejudicial to public esteem for the judicial office.
*CJP Supp. 269 C. Count Two A(2)
1. Findings of Fact
Judge Van Voorhis presided over a jury trial on August 12 and 13, 1999, in People v. Gotchall. Mr. Gotchall was charged with driving while under the influence of alcohol, resisting arrest and driving on a suspended driver’s license. Deputy District Attorney Kathleen McMurray prosecuted the case and Mr. Gotchall was represented by David Larkin, a private attorney.
During the course of the prosecution’s case, Ms. McMurray attempted to introduce evidence of the results of a field sobriety test known as the horizontal gaze nystagmus test. The masters explained that the “theory of this test is that when an officer places a finger in front of a suspect and has the suspect follow the finger with his eyes, the eyes will begin to bounce if there is intoxication.” Prior to introducing the results of the test, Ms. McMurray asked the arresting officer to describe the test. Ms. McMurray had tried another driving while under the influence of alcohol case before another judge and believed the evidence to be admissible. No in limine motion had been filed prior to trial to exclude the test.
During Ms. McMurray’s preliminary questioning of the arresting officer, Judge Van Voorhis sustained an objection to the admission of evidence of Mr. Gotchall’s performance on the test. Judge Van Voorhis told the prosecutor that she needed to be able to lay a foundation for the evidence to be submitted to the jury, and that she would need an expert witness who would testify on the topic. Ms. McMurray told Judge Van Voorhis that she had not subpoenaed an expert. The prosecutor stated that she believed the officer could testify about the administration of the test, and that she did not believe that she needed to produce a separate expert witness.
Judge Van Voorhis did not agree with Ms. McMurray, and he continued, as the masters found, “in a condescending and somewhat hostile tone” to ask: “Now we have opened the door to something that really you have no intention of completing. Do we leave the jury with these half-truths?” Although Judge Van Voorhis told the masters that this statement did not necessarily impugn Ms. McMurray’s motives in front of the jury, the masters emphatically disagreed, finding that in the context in which they were spoken, the fair import of the court’s comments was that counsel was acting inappropriately and perhaps unethically.
After disparaging counsel, Judge Van Voorhis proceeded to disparage the prosecutor’s case by noting that although the officer had seen “a person demonstrate some sort of a symptom,” this did not necessarily connect it to *CJP Supp. 270 alcohol. The judge continued: “Probably everybody she has ever arrested has a smaller finger on the end of their hand. That doesn’t mean that everybody with a small finger is drunk.”
When the prosecutor attempted to move the proceedings along, Judge Van Voorhis responded, “That really doesn’t solve the problem completely, because you went down a road that you could not complete, and now this jury has heard about gaze nystagmus, and they are supposed to wonder what it all means.” Ms. McMurray asked to approach the bench to reach a resolution outside the presence of the jury. The masters found that Judge Van Voorhis “with a smirk on his face, replied, in a condescending and mocking tone,” “And what would you tell me up here?” The prosecutor replied that she had questions for the court, and Judge Van Voorhis told her “ask me now.”
Judge Van Voorhis then conducted a lengthy colloquy critical of Ms. McMurray.[9] The masters found that the judge’s last comments in the *CJP Supp. 271 colloquy were made in a “sing-song sarcastic, and very condescending tone of voice.” They noted that Judge Van Voorhis admitted that he criticized Ms. McMurray’s performance as an attorney and that when he queries an attorney in front of the jury—as he did here—it was with the potential of diminishing the attorney’s credibility in the eyes of the jury.
The masters further found that Ms. McMurray’s perspective on using the officer was reasonable. “In People v. Leahy (1994) 8 Cal.4th 587, 611 [34 Cal.Rptr.2d 663, 882 P.2d 321], our Supreme Court held that once the gaze nystagmus test had been shown to be generally accepted in the scientific community and as reflected in a published opinion, no reason would exist to require an independent expert to testify. A trained law enforcement officer could testify as to the results of the test. The following year, in People v. Joehnk (1995) 35 Cal.App.4th 1488, 1507-1508 [42 Cal.Rptr.2d 6], the court of appeal concluded that gaze nystagmus testing had been accepted in the scientific community. Thus, it appears that the evidence was admissible without further foundation as claimed by Ms. McMurray. No contrary authority was cited by the court.”
*CJP Supp. 272 Finally, the masters discounted Mr. Larkin’s testimony that Judge Van Voorhis was not overly harsh with Ms. McMurray and that she continued to argue with the court after the court had ruled. The masters explained: “We have independently reviewed the transcript and do not accept Mr. Larkin’s version of the events. Clearly, the judge prolonged the argument by asking more questions that were leading nowhere. Moreover, the caustic comments about Ms. McMurray and her case were made in the presence of the jury. Here, there was absolutely no hint of bad faith by the prosecutor as she had tried a case with similar issues before another judge where that court allowed gaze nystagmus evidence before the jury without an expert. Likewise, there was no motion in limine to exclude such testimony. The court’s continued discourse in full view of the jury was wholly unnecessary. Ms. McMurray’s request to handle the matter outside the presence of the jury was denied leaving the jury to hear this discussion.”
In addition to reviewing the transcript, the masters had the benefit of hearing testimony from Judge Van Voorhis, Ms. McMurray, Mr. Larkin and others. The Supreme Court has consistently held that the factual findings of the special masters are accorded “special weight.”[10] The commission, having reviewed all the materials before it, including the masters’ report and Judge Van Voorhis’s objections to the report, adopts the masters’ findings on count two A(2).
2. Conclusions of Law
The masters concluded that Judge Van Voorhis’s remarks constituted willful misconduct. The Supreme Court has held that to commit willful misconduct in office, “a judge must (1) engage in conduct that is unjudicial and (2) committed in bad faith, (3) while acting in a judicial capacity.”[11]
Judge Van Voorhis’s comments were clearly unjudicial. The masters observed that Judge Van Voorhis impugned the prosecutor “by accusing her of starting something she had no intention of finishing” and that by “making this false accusation, the judge abandoned his role of neutrality.” The masters further noted that Judge Van Voorhis “abandoned his role of neutrality by *CJP Supp. 273 interjecting his views and opinions about the gaze nystagmus test.”[12] The masters concluded that Judge Van Voorhis “violated Canon 1 by failing to observe ‘high standards of conduct... so that the integrity and independence of the judiciary will be preserved.’ ” The judge violated canon 2A by failing to act “in a manner that promotes public confidence in the integrity and impartiality of the judiciary,” and he violated canon 3B(4) by failing to be “patient, dignified and courteous” to Ms. McMurray.
As he was presiding over a criminal jury trial when he uttered his comments, Judge Van Voorhis was acting in his judicial capacity.
Judge Van Voorhis contends that his comments cannot constitute willful misconduct because there is no “bad faith.” In his brief, he explains that he felt obligated to advise the jury that it was not to consider the evidence in order to ensure that the criminal defendant received a fair and unbiased trial. In his oral presentation to the commission, Judge Van Voorhis appeared to argue that because his comments arose out of frustration or anger, he did not have a “corrupt purpose” and thus he did not act in “bad faith.”
The Supreme Court has indicated that “bad faith” is not limited to matters involving corruption or moral turpitude,[13] but includes intentionally committed acts, which the judge knew, or should have known, were beyond his or her lawful power.[14] The Supreme Court offers the following relevant explanation: “Because transgressing the limits of a judge’s lawful authority is not the faithful discharge of judicial duties, a judge who performs such acts with no regard at all for whether they are legally permitted cannot be said to be acting with a purpose to faithfully discharge judicial duties. Thus, a judge’s reckless *CJP Supp. 274 or utter indifference to whether judicial acts being performed exceed the bounds of the judge’s prescribed power is a state of mind properly characterized as bad faith.”[15]
The Supreme Court summarizes its analysis of “bad faith” with the following sentence: “A judge acts in bad faith only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.”[16]
Judge Van Voorhis’s explanation that he was concerned that the defendant receive a fair trial, if believed, would justify his ruling and his instruction to the jury. The issue in this count, however, as in other counts, is not whether the judge’s legal ruling was correct. The issue also is not whether counsel provoked the judge. Rather, the issue is how to characterize the judge’s lashing out at counsel.
The judge was clearly authorized to rule and instruct the jury, even if his ruling were ultimately determined to be incorrect. Instead, he engaged in a lengthy colloquy in which he questioned the prosecutor’s motives for seeking to introduce the evidence, ridiculed her perspective and threatened to declare a mistrial if she continued. Judge Van Voorhis conducted this dialogue in front of the jury, and disparaged the prosecutor’s request that the matter be resolved outside the presence of the jury. Furthermore, Judge Van Voorhis did not make a firm ruling until the end of the colloquy after he had ridiculed the prosecutor and prejudiced her case before the jury.
When a judge lashes out in anger or frustration or personally attacks an attorney or becomes embroiled in a matter, the judge abandons his or her judicial role. This is not to suggest that judges do not become frustrated or angry. The California Code of Judicial Ethics, however, restrains the way a judge may manifest anger or frustration. For example, canon 2A states that a judge “shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary,” and canon 3B(4) provides that a judge “shall be” patient, dignified and courteous. Although any evaluation of a judge’s conduct should consider the context in which the conduct took place, the canons apply even when a judge is angry or frustrated.
The masters found that the “judge’s statements here could not have been meant for any purpose other than to deliberately ridicule Ms. McMurray and *CJP Supp. 275 prejudice her case in front of the jury” and accordingly Judge Van Voorhis made his comments “ ‘for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties) The masters, in essence, did not believe Judge Van Voorhis’s rationale for his comments. The commission adopts the masters’ findings on count two A(2) and has no quarrel with the masters’ conclusion of law.
Even if the commission were to accept Judge Van Voorhis’s explanation, it would justify only his ruling (and possibly his instructions to the jury). His concern that the defendant receive a fair trial in no way justifies his deprecation of the prosecutor’s motives, his ridiculing of her perception or his prejudicing of her case before the jury. In other words, the comments cannot be said to have been made in the “faithful discharge of judicial duties.” It is clear that—as he implied in his oral presentation to the commission—Judge Van Voorhis lost his temper and made comments for the corrupt purpose of venting his anger or frustration.
Finally, the commission notes that if bad faith were not apparent under the first of the three tests for “bad faith,” it might well be proved under the third test: “performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” Judge Van Voorhis had been publicly reproved by the commission for his demeanor and, just two weeks before his comments, his presiding judge had cautioned Judge Van Voorhis verbally and in writing about his demeanor. Under these circumstances, Judge Van Voorhis’s attack on the prosecutor’s personal motives and his ridicule of her perspective has the appearance of a “conscious disregard for the limits of the judge’s authority.”
The commission joins the masters in concluding that Judge Van Voorhis’s comments to the prosecutor constituted willful misconduct.[17]
D. Count Two A(3)
1. Findings of Fact
Estaban Alvear is a deputy public defender in Contra Costa County who represented Mr. Hoye in a criminal trial before Judge Van Voorhis in January 2000. Mr. Alvear was bom in Ecuador and had lived in San Francisco for 10 years before the trial. The state was represented by Deputy District Attorney Christine Meade.
*CJP Supp. 276 After a guilty verdict and the imposition of judgment, Judge Van Voorhis, while still on the bench, offered a critique of Ms. Meade’s performance, possibly at her request. After he completed his critique of Ms. Meade, Judge Van Voorhis turned to Mr. Alvear, who was still at counsel table helping his client fill out forms. Judge Van Voorhis, after generally complimenting Mr. Alvear, stated something to the effect that Mr. Alvear’s accent was charming but he should lose it. As noted by the masters, Mr. Alvear did not ask Judge Van Voorhis for a critique of his performance. Mr. Hoye immediately rose to the defense of his attorney saying that he thought Mr. Alvear did a good job.
The masters found that the “comments to Mr. Alvear were hurtful to him personally, and made worse because his client was seated next to him when the remark was made.”
The masters further found that “[i]n a conversation between Judge Van Voorhis and Assistant Public Defender Susan Hutcher that occurred in the hallway of the courthouse, the judge told Ms. Hutcher that Mr. Alvear performed well as an attorney but that he was concerned about Mr. Alvear’s accent. Specifically, the judge said that he needed to lose the accent and suggested that speech therapy might help. Ms. Hutcher explained that Mr. Alvear was from another country and that she thought the accent was charming. Judge Van Voorhis told Ms. Hutcher something to the effect that he thought the accent was annoying or difficult to understand. It was after that conversation that Ms. Hutcher heard about the comments made to Mr. Alvear about his accent.”
Judge Van Voorhis testified that he suggested to Mr. Alvear that he “work on” or “lose” his accent in order to better communicate with the jury and witnesses. Judge Van Voorhis stated that there were two reasons for his comment. First, he felt that because he had made positive and negative comments about Ms. Meade’s performance, Mr. Alvear “may feel slighted if I don’t offer some words of advice.” Second, he testified that when Mr. Alvear was cross-examining the police officer, the officer and others in the courtroom momentarily misunderstood Mr. Alvear’s statement about “walking around” as an obscenity. Judge Van Voorhis admitted that the advice was “uninvited,” “too bluntly stated,” and “perhaps inept.”
The masters, however, stated: “We do not credit the testimony of Judge Van Voorhis that his comments were motivated by concern that Mr. Alvear’s pronunciation of walking was heard by others as cursing. The judge did not mention that to anyone at the time the remarks were made to Mr. Alvear. Secondly, no one else that was present testified to any such concerns. Finally, *CJP Supp. 277 our own perceptions of Mr. Alvear’s accent compel us to discredit Judge Van Voorhis’s alleged concerns.”[18]
Judge Van Voorhis never apologized to Mr. Alvear concerning this incident, even after the public defender wrote him a letter.
The commission adopts the masters’ findings on count two A(3) concerning Judge Van Voorhis’s comment to Mr. Alvear.
2. Conclusions of Law
Judge Van Voorhis’s comment constitutes prejudicial misconduct because it would have appeared to an “objective observer” familiar with the facts and the standards of conduct that the judge’s comment was prejudicial to the public esteem for the judicial office. It is one thing for a judge to respond to a request for advice from a prosecutor who has just won a conviction. This, however, does not justify offering unsolicited criticism from the bench to the losing defense counsel in front of his client. Accordingly, Judge Van Voorhis’s gratuitous remark violated canons 1, 2A and 3B(4), regardless of his subjective intent.
The masters further concluded that Judge Van Voorhis also manifested bias or prejudice based on race or national origin in violation of canon 3B(5). They state that the “comment to Mr. Alvear was insensitive and could have been perceived by members of the public as indicative of bias related to Mr. Alvear’s ethnicity.”
The commission concludes that Judge Van Voorhis’s comment to Mr. Alvear gave the appearance of bias or prejudice based on race or national origin in violation of canon 3B(5). The masters, having observed all the witnesses, including Judge Van Voorhis and Mr. Alvear, concluded that the judge’s comment could reasonably be perceived by members of the public as indicative of bias. The masters’ findings are entitled to special weight,[19] and the commission, having considered the evidence and the judge’s arguments, concurs that the comment gave the appearance of bias or prejudice. Judge Van Voorhis’s subjective intent is not controlling and the commission makes no determination as to his subjective intent.[20]
*CJP Supp. 278 E. Count Two A(4)
1. Findings of Fact
Judge Van Voorhis presided over a criminal jury trial in People v. McDonald in March 2000. The defendant was represented by James Crew. Deputy District Attorney Christine Meade, who had tried her first case six weeks earlier in front of Judge Van Voorhis, was the prosecutor. This was her first trial on a theft-related offense.
A motion in limine was filed concerning the use of a prior conviction for theft for impeachment and the court ruled that the prior conviction was admissible. At trial, the defendant, while under cross-examination, claimed he did not know whether he had been convicted of embezzlement. Ms. Meade then asked the defendant if he was on probation for that conviction and the defendant asked her to repeat the question. The defendant then agreed that he had been convicted of theft, and the prosecutor asked if he was on probation for that offense. At that point, Judge Van Voorhis interrupted and began to interrogate Ms. Meade in the presence of the jury.[21]
The masters stated that after the exchange, “Ms. Meade left the courtroom in tears. She called her supervisor to tell him that she had been accused of misconduct and thought she could be disbarred.”
*CJP Supp. 279 The masters then made the following findings:
“The judge’s demeanor during this exchange, which was all in front of the jury, was extremely demeaning, belittling and sarcastic. Several of the judge’s statements (e.g., ‘And so were you just guessing what you could get away with in a courtroom?’ [and] ‘So when I asked at the beginning of this trial how you were going to prove it, you thought I was just making conversation?’) were sarcastic; the judge admitted that the latter statement had a sarcastic tone.
“The judge’s closing threat, ‘Abide by my rulings or you’ll tangle with me,’ and his reference to law school, T want to know where you learned in law school, or the District Attorney’s Office, that his probationary status is admissible in a court of law’ were undignified and discourteous. The judge has admitted that a similar reference to law school made to William Gardner in the Silva matter was ‘gratuitous,’ ‘demeaning,’ and ‘undignified.’
“The judge’s questioning of Ms. Meade’s motives (‘So, now I want to know what your motives are, because they appear to be—to violate my rulings and to break California law in terms of what is permitted in a criminal *CJP Supp. 280 courtroom, and I’m here to stop you.’) was discourteous and suggested a lack of impartiality. The phrase ‘break the law’ carries the connotation of a criminal act and would be interpreted by the jurors as such. The judge admitted that a ‘skilled judge just doesn’t make those accusations in the presence of the jury . . . .’
“The judge’s statement—‘You see why I feel a little jilted now?’—was personal and undignified. His cross-examination of Ms. Meade (‘Well, you know you can’t do that; don’t you?’; ‘Didn’t you know it at the time of the question?’; ‘You knew that you were going to be confined to those rules of proof because that’s why I was asking the question, to find out what you were going to do; right?’[)] and his personal criticism of her (T made that very clear to you now, and now you have gone off in another direction, without any legal basis whatsoever, and you have made a mistake. I won’t let you do that.’), were also inappropriate, especially when made in front of the jury.
“The judge’s conduct toward Ms. Meade was part of a pattern of being undignified, impatient, discourteous and sarcastic to her. When the judge asked Ms. Meade during a colloquy involving another witness, ‘What is the point?’ and Ms. Meade responded, ‘There really isn’t,’ the judge stated, in front of the jury: ‘Congratulations. You are the first lawyer that has ever admitted that in my courtroom.’
“When Ms. Meade objected to a line of questioning on the ground that the matter should have been raised [at] pretrial, the judge asked where she learned that. When Ms. Meade replied that she learned it from the normal practice, the judge replied, in front of the jury: ‘You are wrong. Study more.’ ”
The commission, having reviewed all the materials before it, adopts the masters’ findings of fact on count two A(4).
2. Conclusions of Law
The transcript shows that Judge Van Voorhis, in the masters’ words: “interjected himself into the proceedings by engaging in a lengthy, antagonistic critique of Ms. Meade’s performance and ethics, in front of the jury, the defendant and opposing counsel. The judge’s statements unnecessarily attacked Ms. Meade’s legal training, professional competence, and motives, and accused her of breaking the law, when it should have been obvious to the judge that Ms. Meade was simply an inexperienced prosecutor who innocently misunderstood what she could do. The judge’s remarks violated his duty to be patient, dignified and courteous, and gave the appearance that he was unable to remain neutral and impartial in the consideration of the matter. *CJP Supp. 281 He unnecessarily embroiled himself, as he has shown a propensity to do on other occasions, in a needless and harmful harangue.”
The commission agrees with the masters that Judge Van Voorhis’s extended remarks to Ms. Meade constitute willful misconduct. They were made in his judicial capacity and were unjudicial as they violated canons 1, 2A and 3B(4).
Judge Van Voorhis defends his comments on the ground that he sought to correct the potential prejudicial effect of the prosecutor’s inquiry into whether the defendant was on probation. Judge Van Voorhis’s contention, like his contention on count two A(2), might well justify his determination not to allow the prosecutor to inquire into the defendant’s probation status, but does not excuse the judge being “undignified, impatient, discourteous and sarcastic” to Ms. Meade in front of the jury. One of the charges against the judge in Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297 [267 Cal.Rptr. 293, 787 P.2d 591] (Kennick) alleged that the judge’s behavior toward the prosecutor was “demeaning, rude, impatient and abusive.” The court agreed with the commission that the judge’s actions constituted willful misconduct, even though the judge’s underlying ruling was not misconduct.[22]
Similarly, in this case there is no challenge to Judge Van Voorhis’s decision to block the prosecutor’s line of inquiry. At issue is Judge Van Voorhis’s personal attacks on the prosecutor’s motives, education and performance. These attacks were not made in the “faithful discharge of judicial duties.” Rather, it is clear that Judge Van Voorhis lost his temper and made comments in bad faith for the corrupt purpose of venting his anger or frustration.
F. Count Two A(5)
1. Findings of Fact
In the Elze case (see count one), Deputy District Attorney Stacey Brock attempted to introduce evidence that the defendant was unable to understand or follow the officer’s directions when attempting to perform the gaze nystagmus test. Ms. Brock was not attempting to introduce the results, only the fact that the defendant could not follow directions.
When Ms. Brock asked the officer whether the defendant appeared to understand what he was supposed to do, Judge Van Voorhis interrupted and the following colloquy took place:
“JUDGE VAN VOORHIS: You are only going to be able to admit this if you bring an expert that’s going to tell us what it means.
*CJP Supp. 282 “MS. BROCK: We won’t be offering the results of it, Your Honor.
“JUDGE VAN VOORHIS: So why even bring it up?
“MS. BROCK: Inability to follow directions.
“JUDGE VAN VOORHIS: You could ask him about that in general, but you know that if you offer evidence of that, they are liable to think it means something, [f] Tell them it does not mean anything.
“MS. BROCK: This doesn’t mean anything.
“JUDGE VAN VOORHIS: Yeah. So why bother with it?
“MS. BROCK: I would like to proceed, your Honor.
“JUDGE VAN VOORHIS: You can ask him if on other tests he failed to follow directions, and take your answer and go with that.
“MS. BROCK [to the witness]: Q. Did the defendant—
“JUDGE VAN VOORHIS: But, you know, I’m not going to let you offer any evidence of what you referred to as horizontal gaze nystagmus because it means nothing, [f] If you can’t follow that instruction from me, raise your hand now. Great. Then we’ll ignore it. Try again. Stay away from that.”
The masters found that this exchange took place in open court in front of the jury, Judge Van Voorhis “was red faced, tense and raised his voice,” and he “pointed when he told Ms. Brock to instruct the jury that it did not mean anything.” They found that Judge Van Voorhis was discourteous and humiliated Ms. Brock in front of the jury. They further noted that Ms. Brock was afraid she was going to be held in contempt by the court.
The masters determined:
“Judge Van Voorhis admitted during the hearing that he had no authority for requiring an attorney to confess mistakes to a jury by requiring the lawyer to speak directly to the jury. The judge testified that he took very serious action because he believed that [he] thought that Deputy District Attorney Brock had jeopardized a fair trial. Judge Van Voorhis stated, ‘[he] felt that [Ms. Brock] was—there was an attempt on her part to have the jury disregard what I was doing as a judge and—’ Judge Van Voorhis testified that Ms. Brock had been trying to undermine his ‘power to rule that this was not admissible evidence.’ Even though the prosecutor limited her basis for *CJP Supp. 283 discussing the gaze nystagmus issue to defendant’s inability to follow directions, Judge Van Voorhis testified that Ms. Brock was ‘leaving the jury with the implication’ that the test could help the jury ‘determine sobriety.’ The judge also testified that Ms. Brock was ‘doing something which she knows she can’t do.’
“Based on the record, we find that the judge’s explanation for his conduct, that he was protecting the defendant’s rights against the prosecutor’s attempt to introduce inadmissible evidence, unconvincing. The proffer made by the prosecutor in compliance with the court’s questionable understanding of the status of the law on gaze nystagmus was that the evidence was not being introduced for the results of the test, only the inability of the defendant to follow directions. It was the court that ignored the proffer and began his finger-pointing, red-faced tirade. This culminated in the humiliating experience of the prosecutor being forced into making a statement that the evidence meant nothing directly to the jury, thus risking her credibility with the jury as the case progressed to conclusion.
“We find that Ms. Brock had done nothing wrong or inappropriate and the conduct and humiliation imposed on her by Judge Van Voorhis entirely inappropriate.”
The commission, having reviewed all the materials before it, adopts the masters’ findings of fact on count two A(5).
2. Conclusions of Law
It is the judge’s role to make evidentiary rulings and instruct the jury if necessary. Here, the masters concluded that Judge Van Voorhis “abused his authority by ordering the prosecutor to admit to the jury that relevant evidence, which she in good faith was attempting to introduce, ‘does not mean anything.’ ” The masters concluded that the judge’s order “served no proper purpose, violated his duty to be patient, dignified and courteous, and gave the appearance that he was unable to remain neutral and impartial in the consideration of the matter.”
The commission agrees with the masters that Judge Van Voorhis’s remarks and order to Ms. Brock to admit that the evidence “does not mean anything” constitute willful misconduct. Judge Van Voorhis was acting in his judicial capacity and his statements were unjudicial in that they violated canons 1, 2A and 3B(4).
Judge Van Voorhis’s determination to exclude any evidence of the gaze nystagmus test is not in issue. At issue is his belittling of the prosecutor and *CJP Supp. 284 his forcing her to make an admission to the jury. These actions and comments were not made in the “faithful discharge of judicial duties.” The masters commented that Judge Van Voorhis “admitted that he knew of no authority in California that permitted him to order a lawyer to confess her mistakes to the jury, and must have known there was none.” As indicated by Judge Van Voorhis’s apparent failure to appreciate that the prosecutor sought only to introduce evidence of the defendant’s inability to follow instructions, Judge Van Voorhis lost his temper and made comments before the jury in bad faith for the corrupt purpose of venting his anger or frustration.
G. Count Two A(6)
1. Findings of Fact
The day following the events described in count two A(5), Mr. Gomes asked his client, Mr. Elze, whether he drank more at home or when he went out. Ms. Brock objected to the question. In the exchange that followed Ms. Brock’s objection, Mr. Gomes several times declined Judge Van Voorhis’s suggestions that the evidence was admissible character evidence to prove a pattern of behavior and that the defendant had acted consistently with that behavior.[23] Nonetheless, Judge Van Voorhis determined that the evidence *CJP Supp. 285 was relevant and turned to Ms. Brock. The masters’ report referred to the following excerpt from the transcript and explanation.
“JUDGE VAN VOORHIS: And so now you see the relevance of it; right? It’s character evidence, obviously, and there has been a lot of it already, so it’s clearly relevant; isn’t it? Isn’t it? Tell me.[24]
“MR. GOMES: No.[25]
“JUDGE VAN VOORHIS: You tell me that it’s relevant.
“MS. BROCK: Do you want me to say that it’s relevant, your Honor?
*CJP Supp. 286 “JUDGE VAN VOORHIS: Sure, it is; isn’t it?[26]
“MS. BROCK: Yes.”
The masters’ findings of fact concluded with the following paragraph. “The remarks made by the judge were in front of the jury and clearly done with the intent of forcing Ms. Brock to agree with him. Ms. Brock felt humiliated by the judge who was angry, loud, short-tempered and red-faced. Our review of the transcript reveals nothing done by Ms. Brock to provoke such a response by Judge Van Voorhis. She replied yes to the judge’s question, even though she believed the evidence was not relevant, because she was afraid the judge would hold her in contempt. The judge’s testimony on this subject was that he allowed Ms. Brock to be heard because he had to ‘give her an opportunity to speak’ and argue the evidence was not relevant. This explanation was not credible because the judge clearly badgered Ms. Brock into acquiescence. Ms. Brock’s version of the incident is far more credible and is supported by the transcript.”
The commission, having reviewed all the materials before it, adopts the masters’ findings of fact on count two A(6).
2. Conclusions of Law
The masters concluded that Judge Van Voorhis’s remarks and order to Ms. Brock constituted willful misconduct as they were unjudicial, were made in bad faith and were made in his judicial capacity. The masters noted that although it is the judge’s role to make evidentiary rulings and instruct the jury if necessary, Judge Van Voorhis abused his authority by forcing the prosecutor to agree with his ruling, admit to the jury that evidence to which she was objecting was relevant, and confess to the jury that she made a mistake.
The commission agrees with the masters that Judge Van Voorhis’s statements constituted willful misconduct and violated canons 1, 2A and 3B(4) as they “served no proper purpose, violated his duty to be patient, dignified and courteous, and gave the appearance that he was unable to remain neutral and impartial in the consideration of the matter.” The evidence shows that Judge Van Voorhis once again lost his composure and made comments before the jury for the corrupt purpose of venting his anger or frustration. The commission agrees with the masters that Judge Van Voorhis’s contention that he intended to give the prosecutor an opportunity to register an objection under Evidence Code section 352 is not credible because the judge clearly badgered the prosecutor into acquiescence.
*CJP Supp. 287 H. Count Two B
I. Findings of Fact on Count Two B(l)
Ms. Carmichael, a court clerk in the Contra Costa Superior Court, was assigned to work as a fill-in clerk for Judge Van Voorhis on July 13, 1999. The judge asked her to check the jury trial calendar for later in the week and to have the files brought upstairs so he could look at them. Ms. Carmichael called downstairs to the clerk’s office and the office responded that they would get the files upstairs as soon as they could. Ms. Carmichael told the judge that there were six jury trials scheduled. When the files were not immediately brought up, Judge Van Voorhis began to get angry. The clerk’s office advised that of the six files, they were missing two. When the files were brought to the courtroom, Ms. Carmichael handed them to the judge. The masters found that while court was in session, Judge Van Voorhis angrily told Ms. Carmichael to call and find out where the missing files were. They further found that he pointed his finger at the clerk when he was speaking harshly to her.
Judge Van Voorhis testified that he had no recollection of the incident. He testified that in the morning he had notified the presiding judge that he would be free the following day to handle assignments. Judge Van Voorhis explained that Ms. Carmichael had failed to notify him that there were cases scheduled before him the following day. This prompted Judge Van Voorhis to tell the supervising clerk, Ms. Morgado, that he hoped that his replacement clerk was properly trained to make sure that there were no pending matters on calendar the next day.
During the noon recess, Ms. Morgado told Ms. Carmichael that Judge Van Voorhis was upset with her. When Ms. Carmichael returned to the courtroom after lunch, Judge Van Voorhis told her how important it was for him to have accurate information about his caseload to report to the presiding judge. He further told her that otherwise he looked like he did not know what was going on in his own courthouse. Judge Van Voorhis testified that he noticed that Ms. Carmichael was becoming teary eyed as he spoke to her and that he stopped.
The afternoon calendar included “in custody” defendants and “volaps” (individuals that voluntarily appear on bench warrants or violations of probation). None of the volaps were in the courtroom when the calendar was called.
*CJP Supp. 288 The masters found that in “an angry tone of voice,” the judge said, “I have no bodies. I have these files. What’s going on?” As Judge Van Voorhis was saying this, he threw the files over the ledge of the bench. The stack of files was about four inches high. The judge was very, very angry when he threw the files. The judge never apologized for throwing the files.
Ms. Carmichael was shocked and started to tear up as she picked up the files. Ultimately, she telephoned a neighboring courtroom and found the defendants who had been sent to the wrong courtroom.
Judge Van Voorhis denies that he threw the files at Ms. Carmichael. He testified that he put the files on a tabletop next to his computer and directed Ms. Carmichael to go and get the missing defendants. He stated, “If it fell, it was accidental. Believe me.” The judge testified that he did not remember if the files spilled over to the other side.
Judge Van Voorhis attributed his lack of memory to the delay in informing him of the accusation. The masters commented: “Indeed, the judge went to great lengths to claim that no one ever told him that ‘it was the throwing of the files that was the problem.’ He even wrote a letter to Presiding Judge Mark Simons, after meeting with him on August 4, 1999, and stated that they had not discussed the ‘details relating to the incident,’ and that Judge Van Voorhis had never been told what Ms. Carmichael had reported to the presiding judge. Judge Van Voorhis testified that because the presiding judge never wrote back to tell him ‘what this was all about,’ he was ‘in a worse position to defend’ himself in front of the masters.”
The masters found that “despite his denials, the truth slipped out during cross-examination.” When discussing his lack of memory, Judge Van Voorhis testified: “Because I know at the instant I threw the files—human beings looking in that direction are going to have, you know, the ability to perceive it.”
After completing the calendar Ms. Carmichael began to cry. She went to Ms. Morgado’s office. As a result of her report, Ms. Carmichael was not sent back to Judge Van Voorhis’s courtroom and a complaint was filed with Paul Kunkel, the human resources officer.
Presiding Judge (now Justice) Mark Simon drove to Walnut Creek to meet with Judge Van Voorhis to discuss the incident and to make sure the conduct did not occur again. Judge Simon thought that Judge Van Voorhis clearly recognized that “his demeanor may have been such that it was viewed as *CJP Supp. 289 harsh and rude.” Judge Simon indicated that he was interested in making sure that the behavior did not recur and recommended that Judge Van Voorhis enroll in a counseling or anger management program. Judge Van Voorhis replied that he was not interested in either program, but that he had private resources if he decided it was necessary. Judge Simons told Judge Van Voorhis that the incident could not be repeated and Judge Van Voorhis accepted that the conduct needed to be avoided in the future. Judge Simons sent a letter to Judge Van Voorhis memorializing the conversation and his advice that the conduct must not be repeated.
The commission, having reviewed all the materials before it, adopts the above recitation of the masters’ findings as its findings of fact on count two B(l).
2. Findings of Fact on Count Two B(2)
Ms. Van Horn has been a courtroom clerk in Contra Costa County for 20 years. She filled in for Judge Van Voorhis’s court clerk on April 19, 2000. When she arrived in the courtroom, the lawyers were completing their closing arguments in a jury trial.
It is the clerk’s job at the end of the proceedings to swear the bailiff to take charge of the jury. After the judge gave closing instructions, the bailiff walked over to Ms. Van Horn and both raised their right hands and the oath was given. Ms. Van Horn administered the oath in the same way she had administered it in every other case, including cases in which Judge Van Voorhis had presided.
The masters found that after “she swore the bailiff, the judge stood up and told Ms. Van Horn that she had wasted 20 seconds of the court’s time by swearing the bailiff on the record. He was red faced, tense and upset with her.” They found that he also told her that there was a manual in the courtroom that would explain the correct procedures. The masters noted that jurors, the district attorney, defense counsel, members of the audience and the defendant were present in the courtroom.
Ms. Van Horn was shaken and experienced shortness of breath. She felt embarrassed and humiliated. After composing herself, Ms. Van Horn went with another clerk back into the courtroom, retrieved the manual and found that it made no reference to swearing the bailiff off the record.
Both Michael Markowitz, an experienced defense attorney, and Ms. Christine Meade, the prosecutor in the case, agreed that the method used by Ms. Van Horn to swear in the bailiff was the same they had seen in all other jury trials.
*CJP Supp. 290 Judge Van Voorhis stated in his verified answer that he “expressed a desire to Ms. Van Horn to dispose of cases in a more timely manner.” He testified that he told her “in [a] conversational tone”—“the way I often do with clerks”—that within the previous couple of months, they had started swearing in the bailiff off the record and that the law does not require that the bailiff be sworn in on the record. He testified that he indicated that it saved only about 30 seconds, and that it did not matter to him if she wanted to swear in the bailiff on or off the record. He denied that he told her she had wasted 20 seconds of time or that there was a folder with written instructions on how to swear in the bailiff.
The masters credited “the testimony of Ms. Van Horn and Mr. Markowitz who corroborated her testimony.” They rejected “the testimony of Judge Van Voorhis. Ms. Meade testified that the judge demanded to know of Ms. Van Horn how much of the court’s time she had wasted to which Ms. Van Horn responded about 10 seconds. We find that the comments of Judge Van Voorhis were uncalled for, belittling and sarcastic.” “We conclude that the criticism of Ms. Van Horn was inappropriate and unjust. She had followed the directions contained in the courtroom manual and Judge Van Voorhis failed to explain any policy changes in his courtroom. His characteristic overreaction was so distressful to the clerk that she requested not to be assigned to Judge Van Voorhis’s courtroom in the future.”
The commission, having reviewed all the materials before it, adopts the masters’ findings of fact on count two B(2).
3. Findings of Fact on Count Two B(3)
Ms. Brown is a deputy sheriff in Contra Costa County and is assigned to the Court Services Bureau. On December 26, 2000, she filled in as a security deputy in Judge Van Voorhis’s courtroom. Her responsibilities included “the maintenance of inmates and getting them into the courtroom assuring that the proper inmates appeared in court.” She had never worked in Judge Van Voorhis’s court before.
At around 7:00 a.m., Deputy Brown compared the list of inmates being transported to court with a list of inmates needed by the court. She noticed that there was an inmate, Ms. Johnson, who was not being transported, but was listed on the court calendar. Deputy Brown called the transportation unit and the main detention facility and was told that the records showed that the court date had been vacated and that Ms. Johnson did not need to appear. When Judge Van Voorhis’s bailiff, Deputy La Fortune, came to work around 8:15 a.m., Deputy Brown advised him of the fact that Ms. Johnson was not *CJP Supp. 291 being transported because jail records showed that her court date had been vacated.
Deputy Brown then reported to the courtroom because the “in custody” calendar was starting. Her task was to get each inmate defendant and bring the person into the courtroom. During the course of the morning, Deputy Public Defender Quandt asked Deputy Brown to have Ms. Johnson brought out so he could speak with her. The request was made in the courtroom in the presence of Judge Van Voorhis, Deputy La Fortune and several attorneys.
The masters found that Deputy Brown informed Mr. Quandt that Ms. Johnson “had not been transported because her court date was shown to be vacated.”[27] Mr. Quandt told Deputy Brown that there was a mistake and that Ms. Johnson needed to be in court that day. Judge Van Voorhis testified that when he overheard this conversation, he spoke up immediately. “I started off with, ‘You need to learn how to do your job,’ and I stopped myself. And I started that sentence over. [1] And I said, ‘You need to learn how to do your job in my courtroom.’ And I said, ‘Steve is going to teach you how to do your job in my courtroom, aren’t you, Steve?’ Steve was standing right there. [][] And then I believe I repeated, ‘Steve is going to teach you’ or ‘help you to learn how to do your job in my courtroom.’ ”
The masters found that Judge Van Voorhis further stated that Deputy Brown needed to learn how to do her job so he did not blow his top in open court and that Deputy La Fortune was going to show her how to do her job. The masters found that when the judge made those remarks, he was angry, agitated and irritated. He was pointing his finger at Deputy Brown and he had a clenched jaw.
Deputy Brown was embarrassed by the remarks that were made in open court. She felt she was doing her job and had done nothing wrong. One of the inmates found the judge’s remarks amusing. Judge Van Voorhis never asked her why the inmate was not there and never apologized for his remarks.
Judge Van Voorhis testified that Deputy Brown should have directly communicated to him the fact that Ms. Johnson was not being transported. He testified that he was concerned how the public would perceive Deputy Brown’s statement in open court that the inmate was not coming to court.
*CJP Supp. 292 The masters found the charge that the judge chastised Deputy Brown in a belittling tone to be sustained by clear and convincing evidence. Judge Van Voorhis stated there had been a long history of inmates not being transported to court by the sheriff’s department, but he admitted that he did not know whether Deputy Brown was at fault and her conduct was not disrespectful to the court.
The commission adopts the masters’ findings of fact on count two B(3).
4. Conclusions of Law on Count Two B
The commission agrees with the masters’ conclusion that Judge Van Voorhis’s “public criticisms of court personnel were harsh, rude and intemperate, and continued despite a 1992 public reproval for conduct that included twice giving directions to his staff in a manner that was perceived to be harsh and despite a warning from the presiding judge following the [Ms.] Carmichael incident.”
The masters noted: (a) “In the incident involving [Ms.] Carmichael, the judge had a temper tantrum that included throwing files, and reduced a temporary clerk to tears”; (b) “In the incident involving [Ms.] Van Horn, the judge unfairly berated an experienced clerk in open court for swearing in a bailiff in the customary manner” and “also told the clerk that she would have known better if she had read his courtroom manual, even though the manual contained nothing that indicated that the clerk had done anything wrong”; and (c) “In the incident involving Deputy Brown, the judge took out his frustration with the sheriff’s department by publicly humiliating a new security deputy who had never before performed those duties, and who was not at fault.”
The judge’s conduct in each of the three instances constituted prejudicial misconduct as it would have appeared to an “objective observer” familiar with the facts and the standards of conduct that the judge’s comments were prejudicial to the public esteem for the judicial office. Similar conduct by other judges toward personnel has been found to be prejudicial misconduct.[28] Judge Van Voorhis’s conduct violated canons 1, 2A, 3B(4) and 3C(1) [29]
*CJP Supp. 293 I. Count Two C
1. Findings of Fact
People v. Sowande was a jury trial before Judge Van Voorhis on August 17 and 18, 2000. The charge was driving under the influence of alcohol and driving with an invalid license. The issue was whether the defendant, at the time that he was drunk, was actually driving.
Mr. Lewis, a defense witness, testified that he drove the defendant to the place where the defendant was later arrested, exited the car and left the keys in the ignition. The defendant testified that after Mr. Lewis left, he moved to the driver’s seat, but did not go anywhere because he did not feel well and he fell asleep until a police officer woke him. The police officer testified that when he shook the defendant to consciousness, the defendant reached for the keys in the ignition to start the car. The defense contended that a conviction could not be based on the defendant fumbling for his keys and attempting to start the car. Rather, a conviction could only be based on the defendant actually driving the car.
During deliberations, the jury sent several written questions to the judge. The last of these questions was: “Could the intent of the defendant, the act of reaching for the keys to start the car, be considered driving under the influence of alcohol?” After a discussion with counsel, Judge Van Voorhis decided that the answer to the jury’s question was no. The judge then asked counsel if they wanted the jury brought back into the courtroom to receive the answer, and defense counsel opted to have the jury brought back.
When the jury was assembled, Judge Van Voorhis, while looking directly at the jury foreman, addressed the jury as follows: “Mr. Foreperson, I’ll give the answer to my question [sz'c], the parties and jurors are present, and you’ll be able to take it with you to the deliberating room. [][] I normally correspond in writing, but this time I’ve decided to answer your question orally, because I want you to look at the question you gave me. And you’ll see that you could improve on your English, and therefore your question could be way more precise for me. [f] And one of the things you can help me to do is to make your questions as precise as possible, which means look *CJP Supp. 294 them over several times, because an English teacher would object to the wording of that question. But I’ll read it to you and then you’ll see my answer.” The masters found that “Judge Van Voorhis’s voice was condescending, arrogant, belittling, very nasty and derogatory.” There was a wide variety of educational backgrounds among the jurors. One juror had a third grade education, others had college degrees. All of the jurors seemed upset by the judge’s remarks.
Mr. M., a registered nurse, was the foreperson of the jury. He felt it was an honor to be on the jury and sought to do the best he could as a citizen. He was astounded by the judge’s comments and felt that he was being questioned in front of the rest of the jury. The masters found that “the judge’s comment almost affected the outcome of the case because Mr. M. was so upset that he considered deciding the case on grounds other than the evidence. But in an effort to be fair, he based his decision in the case on the evidence, not his anger at the judge.”
Judge Van Voorhis “testified that he wanted to explain to the jurors that they were coming into the courtroom to hear his answer when, on previous occasions, he had responded to their questions in writing.” When defense counsel requested that the jury be brought in, the “first thing” that came through the judge’s mind was that, because he had “given her an adverse ruling, maybe this was payback or something.” It also occurred to Judge Van Voorhis that defense counsel might be trying to “attract attention to this as a particular issue and try to emphasize it for the jury in hopes that they would continue to focus on that . . . .” The judge testified that he did not want the jurors to speculate why they were being brought into the courtroom, or to draw any inference from it. He also testified that he anticipated additional questions from the jurors and he wanted them to be precise in their questions. Once he brought the jurors in, he decided that he would say something about the imprecision of the question.
The commission adopts the masters’ findings of fact on count two C.
2. Conclusions of Law
The commission agrees with the masters that Judge Van Voorhis’s comments constituted prejudicial misconduct and violated canons 1, 2A and 3B(4). As noted by the masters, the comments “were unnecessarily disparaging and embarrassing to the jury foreperson, as well as to the other members of the jury whose thought processes were represented in the question. The judge made his comments after receiving a public reproval in 1992 for conduct that included questioning a potential juror in each of two criminal cases in such a way that each person perceived a ‘lack of sensitivity’ and felt ‘intimidated.’ ”
*CJP Supp. 295 DISCIPLINE
A. Criteria
Once the commission has determined that the allegations of misconduct have been demonstrated by clear and convincing evidence, the commission must determine the appropriate discipline. The commission takes as its mandate the Supreme Court’s statement that the purpose of the proceeding “ ‘is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ”[30] This is consistent with the Supreme Court’s prior statement that the purpose of these proceedings “is not to punish errant judges but to protect the judicial system and those subject to the awesome power that judges wield.”[31]
The Supreme Court has recognized that in determining the appropriate discipline, each case must be considered on its own facts. “Proportionality review based on discipline imposed in other cases, however, is neither required nor determinative. The factual variations from case to case are simply too great to permit a meaningful comparison in many instances. ‘Choosing the proper sanction is an art, not a science, and turns on the facts of the case at bar.’ ”[32]
Even though each case is considered on its own facts, the commission looks to opinions of the Supreme Court and its own prior decisions for guidance in exercising its responsibility to determine the appropriate discipline. The commission has identified five considerations that are relevant to its determination of the appropriate discipline in this case: (1) the number of acts of misconduct; (2) the effect of any prior discipline on the judge’s conduct; (3) whether the judge appreciates the inappropriateness of his or her actions; (4) whether the judge is likely to continue to engage in unethical conduct; and (5) the impact of the judge’s misconduct on the judicial system.[33]
In addition, the commission considers any mitigating factors that a judge may advance.
*CJP Supp. 296 1. The Number of Acts of Misconduct
In decisions concerning the removal of judges, the Supreme Court has often noted the number of acts of misconduct.[34] In Furey, the court explained that “the disposition of a case depends in large measure on the nature and number of charges found to be true . . . ,”[35] There does not appear to be any minimal number of acts of misconduct required for removal. Rather, as noted by the Supreme Court in Fletcher. “ ‘The number of wrongful acts is relevant to determining whether they were merely isolated occurrences or, instead, part of a course of conduct establishing “lack of temperament and ability to perform judicial functions in an even-handed manner.” [Citation.]’ (Wenger, supra, 29 Cal.3d at p. 653.) We have determined that petitioner twice committed willful misconduct and committed prejudicial misconduct on multiple occasions. ‘Together these incidents reflect a continuing, pervasive pattern of’ misconduct. (Kloepfer, supra, 49 Cal.3d at p. 849.)”[36]
Similarly, in Adams the Supreme Court noted: “[T]he misconduct that we have determined justified this most severe of disciplinary sanctions generally has involved a pattern of arbitrary, irrational and inappropriate conduct of the judge while acting on the bench in dealings with litigants, attorneys, witnesses, and other persons, or while otherwise performing his or her judicial functions, and an abuse of his or her judicial powers and authority.”[37]
Most recently, the commission ordered Judge Platt’s removal from the bench based on five acts of willful misconduct and two acts of conduct prejudicial to the administration of justice that brings the judicial office into disrepute.[38]
*CJP Supp. 297 2. Prior Discipline
The second consideration is the effect of any prior discipline on the judge’s conduct. In Doan, supra, 11 Cal.4th 294, 339, the Supreme Court removed a judge for willful and prejudicial conduct that displayed moral turpitude, dishonesty and corruption, but noted that it “would hesitate to remove a judge who showed himself ready, willing, and able to reform under a less severe sanction.”[39] The Supreme Court, in removing Judge Doan, noted:
“Lastly, Doan did not learn from her public reproval in 1990 for lending the prestige of her office to advance the private interest of others. She again lent the prestige of her office to advance the private interest of others, even though she had promised not to do so in connection with the 1990 public reproval, in the matters relating to Darlene’s nephew Darren Powell in 1992, Meneses in 1993, and Darlene herself in 1993.
“In sum, Doan has had three opportunities for reformation. She will have no more.”[40]
Similarly, the Supreme Court in McCullough, supra, 49 Cal.3d 186, 199, in removing the judge from office noted: “. . . his failure to respond to our public censure evidences a lack of regard for the Commission, this court and his obligations as a judge.”
In its decision ordering the removal of Judge Platt from the bench, the commission noted that “the failure of past sanctions to effect a change in conduct also suggests a lack of ability to reform and unsuitability for judicial office.”[41]
Although the existence of prior discipline is a relevant factor, the Supreme Court has removed judges who had not been the subjects of prior discipline.[42]
3. Appreciation of Misconduct
The third consideration is whether the judge appreciates the inappropriateness of his or her conduct. In Fletcher, the Supreme Court noted that *CJP Supp. 298 “contrary to the contrite tone he sounds in this court, petitioner’s primary response to the misconduct allegations during the Commission proceedings was to allege a conspiracy against him.”[43] The court concluded as to Judge Fletcher that: “[T]he record ‘belies petitioner’s claim that he has learned from past experience and has modified his courtroom behavior. It demonstrates instead an inability to appreciate the importance of, and conform to, the standards of judicial conduct that are essential if justice is to be meted out in every case.’ (Kloepfer, supra, 49 Cal.3d at p. 866, fn. omitted, original italics.)”[44]
4. Likelihood of Future Violations
The fourth consideration is whether the judge is likely to continue to violate the California Code of Judicial Ethics. The Supreme Court in its opinion removing Judge Fletcher from the bench concluded that the judge’s perspective did not suggest that he had overcome his demonstrated lack of judicial temperament and, accordingly, similar incidents were likely to recur.[45]
In Kloepfer, the Supreme Court in removing the judge noted that his “lack of judicial temperament is manifest” and stated: “The record does not suggest that petitioner has, or will be able to, overcome this trait and that similar incidents will not recur. For this reason comparison of the discipline imposed in other cases, as petitioner suggests, is not fruitful. Our role is to determine, in the individual case, the action necessary to protect the public and the reputation of the judiciary. The evidence fully supports the conclusion of the Commission that this purpose requires that petitioner be removed from the bench.”[46]
In its decision to remove Judge Platt, the commission concluded that Judge Platt was “unlikely to conform his future conduct to the canons.”[47] However, the commission issued a public censure of Judge Willoughby, rather than ordering removal, in part because it could not conclude that the judge’s pattern of inappropriate conduct was “so continuing or pervasive as to preclude his reformation.”[48]
*CJP Supp. 299 5. Impact of Misconduct on the Judicial System
The fifth consideration concerns the impact of the judge’s misconduct on the judicial system. How has the judge’s misconduct prejudiced the judiciary’s reputation or the actual administration of justice? This concern with the effect of the misconduct upon the integrity of and respect for the judiciary is inherent in the Supreme Court’s determination in Fletcher that Judge Fletcher’s removal was “necessary to protect the public and the judiciary’s reputation.”[49]
In Adams, the Supreme Court removed Judge Adams from the bench, noting that he had “engaged in successive extrajudicial transactions . . . creating an appearance of serious impropriety and thereby tending to diminish the public esteem of the judiciary—a consequence petitioner either deliberately ignored or was unable to appreciate.”[50] The importance the court gave to the impact of the misconduct on the judicial system becomes evident when contrasted with the considerable character evidence in support of Judge Adams[51] and Justice Mosk’s strong dissent.[52]
The impact of the misconduct on the judiciary also has been recognized in other states as a factor in determining the appropriate level of judicial discipline. The Michigan Supreme Court has indicated that among the criteria to be used in evaluating judicial misconduct is that “misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety . . . .”[53] The Washington Supreme Court has listed as a factor in determining the appropriate discipline “the effect the misconduct has upon the integrity of and respect for the judiciary.”[54] The Arizona Commission on Judicial Conduct has adopted a rule which lists factors that may be considered in determining *CJP Supp. 300 appropriate disciplinary action including, “the nature and extent to which the acts of misconduct injured other persons or respect for the judiciary.”[55]
6. Mitigating Factors
The Supreme Court has stated that character evidence and evidence of a judge’s contributions to the judicial system do not mitigate or excuse misconduct, but may be considered in determining the appropriate discipline. In Adams, the Supreme Court noted: “The foregoing evidence of petitioner’s qualifications for and contribution to the judicial system, during the course of a lengthy judicial career, does not mitigate or excuse petitioner’s wilful misconduct or prejudicial conduct. (Spruance v. Commission on Judicial Performance [(1975)] 13 Cal.3d 778, 800 [119 Cal.Rptr. 841, 532 P.2d 1209].) We may, however, and do take these factors into account in considering the totality of the circumstances that are pertinent to our determination of the appropriate discipline. (See McCartney v. Commission on Judicial Qualifications[, supra,] 12 Cal.3d 512, 539-540 . . . ,)”[56]
In Broadman, the Supreme Court reiterated that evidence that a judge is industrious and innovative does not mitigate or excuse willful or prejudicial conduct, and indicated that the commission had properly considered evidence in mitigation in the determination of the appropriate discipline.[57]
B. Applying the Criteria to Judge Van Voorhis
1. The Number of Acts of Misconduct
The commission and the masters conclude that Judge Van Voorhis had engaged in four acts of willful misconduct and seven instances of conduct prejudicial to the administration of justice that brings the judicial office into disrepute. These 11 incidents of misconduct took place between June 1999 and December 2000. The masters described the situation as follows: “We conclude from the evidence that Judge Van Voorhis has a serious problem with judicial temperament and self-control. Witness after witness has come forward with believable testimony concerning abusive conduct by Judge Van Voorhis. The witnesses have run the gamut from public lawyers, privately retained counsel, new court staff, a member of law enforcement, a veteran court staffer and members of a jury. Unfortunately, Judge Van Voorhis *CJP Supp. 301 allowed his impatience and seeming compulsion to display his judicial authority to embarrass, humiliate or simply humble those who cross him. Sadly, he has done this to lawyers in front of jurors creating the risk of having cases decided on other than the merits. On one occasion, Judge Van Voorhis embarrassed a lawyer with an accent in front of the client.”
The masters also stated that the instances of misconduct were not isolated occurrences, but were indicative of a lack of judicial temperament. The masters wrote: “The record establishes by clear and convincing evidence that Judge Van Voorhis’s actions ‘cannot be characterized as occasional lapses or isolated instances of misconduct.’ Rather, there has been ‘a persistent pattern of abuse and arbitrary conduct. . . .’ (Kloepfer, supra, 49 Cal.3d 826, 833.) In Judge Van Voorhis’s case, the instances of misconduct have been ‘too numerous to permit us to speculate that [the judge] was guilty of misconduct only in isolated occasions which might be individually explained and excused.’ (Cannon v. Commission on Judicial Qualifications, supra, 14 Cal.3d 678, 705.)”
2. Prior Discipline
Judge Van Voorhis was publicly reproved in 1992, received a private admonishment in 1994, and was advised orally and in writing by his presiding judge in early August 1999 that he still had a demeanor problem that needed to be addressed.
The 1992 public reproval included the following instances of unethical conduct by Judge Van Voorhis:
“In two criminal cases in May 1989 and April 1990, your conduct during questioning of a potential juror in each case caused that person to perceive a lack of sensitivity and to feel intimidated by your questioning.
“In October 1991, when arrangements for the loaning of the neighboring court reporter faltered, you entered the adjoining courtroom through a side door wearing your judicial robe and immediately directed that the court reporter be sent to your courtroom. Your inappropriate interruption of the proceedings was an abuse of authority.
“On two occasions, you gave directions to your court staff in a manner which was perceived as harsh.
“In two criminal cases in December 1989 and December 1990, you used a sarcastic and intimidating tone toward the attorneys appearing before you when they requested continuances.”
*CJP Supp. 302 The public reproval states that in determining that a public reproval “would be adequate discipline,” the commission considered “the absence of prior discipline, your recognition that you should have handled the incidents differently, and your assurance that this conduct will not be repeated.”
The 1994 private admonishment states that Judge Van Voorhis “issued Contra Costa subpoenas and signed them using his official judicial title in his own dissolution case in Solano County.” Judge Van Voorhis’s defense was that, although doing anything as a judge in his own case initially struck him as improper, he thought his act was a “mandatory ministerial act” and therefore, he could perform it even in his own case.
On August 4, 1999, as a result of Judge Van Voorhis’s treatment of Ms. Carmichael (see count two B(l)), Presiding Judge Simons traveled to the Walnut Creek courthouse to meet with Judge Van Voorhis. The presiding judge memorialized the meeting in an August 5, 1999 letter to Judge Van Voorhis. The letter noted: “Primarily, we discussed the incident involving Kim Carmichael on July 13. Before I mentioned any details relating to the incident, you indicated you were aware of my concern because you had been informed that an investigator was talking to individuals at the courthouse. You expressed great regret at the incident and described in some detail the many different efforts you have made since the CJP public reproval in 1992 to modify the ways you interact with staff.”
Presiding Judge Simons indicated that he was impressed with Judge Van Voorhis’s “obvious sincerity in recognizing the problem raised by the incident with Ms. Carmichael and the need to resolve it.” He explained that he believed “the issues I was aware of required me to bring them to your attention and to discuss ways to avoid repetition.” The presiding judge mentioned two programs that Judge Van Voorhis might take, including a course on anger management. The letter noted that Judge Van Voorhis indicated that he would not follow up on the suggestions, “not because [he] rejected the need for such assistance, but that [he] felt [he] had adequate private resources to draw on for this assistance.” The presiding judge’s letter concluded: “I very much appreciated your attitude during the meeting, but must underscore my insistence that there be no repetition of these incidents.”
Despite his reassurances to his presiding judge, within two weeks of the meeting, Judge Van Voorhis engaged in misconduct in the Gotchall trial by questioning the prosecutor’s motives for seeking to introduce evidence, ridiculing her perspective in front of the jury and threatening to declare a mistrial if she continued. (See count two A(2).) With the exception of Judge *CJP Supp. 303 Van Voorhis’s comments in the Silva trial (count two A(l)) and his comments to Ms. Carmichael, all of the charged incidents of unethical conduct occurred after Judge Van Voorhis met with Presiding Judge Simons. Whatever the effect of the public reproval and private admonishment on Judge Van Voorhis’s conduct prior to the summer of 1999, his meeting with Presiding Judge Simons with its reference to his prior public reproval did not deter Judge Van Voorhis—in the words of the masters—from continuing “with the same issues of judicial temperament that have previously brought him to the attention of the Commission.”
3. Appreciation of Misconduct
Judge Van Voorhis “acknowledges” that he should not have made some of the comments he did, but this is at best a conditional admission. In addition to challenging the masters’ findings, Judge Van Voorhis in his briefs argued that “the conduct at issue here usually arose from an argument over a disputed evidentiary issue (or jury instruction) in the heat of the moment during trial, or it was the result of a failure of the court staff to adequately perform their duties.”
In Cannon, Judge Cannon proffered a similar defense when she sought to mitigate her misconduct on the basis of frustrations provoked by “ ‘inexperienced and sometimes disrespectful lawyers.’ ” The Supreme Court first found that the record did not support the judge’s “claim that the numerous deputy public defenders involved in the misconduct charged and found to be true were disrespectful or that their inexperience reasonably could have frustrated petitioner or have provoked her unwarranted conduct.” The court noted that “ ‘[Ejven assuming arguendo that the evidence was clear and convincing, disrespect on the part of the public defender cannot serve to justify petitioner’s injudicious response.’ ”[58]
In Gonzalez, the Supreme Court rejected the judge’s attempt to blame the disciplinary proceedings on his detractors. The court noted: “In the final analysis Judge Gonzalez utterly fails to grasp either the substance or the seriousness of the numerous charges levelled against him by the Commission. Despite multiple admonitions and the normal evidentiary limitations of the hearing process, Judge Gonzalez has treated this investigation as an attack on his character. Thus he boasts he is opinionated, outspoken, hardworking, and extroverted, but never prejudiced and always impartial. He persists in his *CJP Supp. 304 theory that his adversaries conspired to record his every misdeed and regards virtually every allegation as personally motivated. Rather than respond affirmatively and convincingly to the specific charges, he expends most of his defense effort in attacking the character and credibility of the adverse witnesses. While he concedes there may be certain minor irregularities in his judicial manner and procedures, he denies that he has ever deliberately abused his judicial office and generally refuses to admit he has done anything improper.”[59]
The record here does not support Judge Van Voorhis’s suggestion that his unethical conduct can be justified on the basis of “the heat of the moment” or by actions on the part of attorneys or court employees. To the contrary, the record indicates that Judge Van Voorhis fails to appreciate the inappropriateness of his conduct.
Ms. Brock did not provoke the conduct charged in count one. Judge Van Voorhis chose to comment on his controversial ruling and to do so in such a way that it was reasonably perceived as indicating that he kept the evidence out to see how the prosecutor reacted. As previously noted, Judge Van Voorhis continued to give this impression in his testimony before the masters.
In his brief to the commission, Judge Van Voorhis stated that he regrets his comments to Mr. Gardner (count two A(l)) and suggests that this is a “significant fact in mitigation.” The judge’s testimony, however, was somewhat equivocal[60] and there is no indication that the judge ever apologized to Mr. Gardner.
There is little in the transcript to suggest that Ms. McMurray provoked Judge Van Voorhis’s comments (count two A(2)). She honestly and reasonably believed that the evidence was admissible. When Judge Van Voorhis indicated that Ms. McMurray could not qualify the police officer as an expert, Ms. McMurray twice offered to move on and then asked to approach the bench.[61] There was no provocation for Judge Van Voorhis’s response.
*CJP Supp. 305 There is no indication that Judge Van Voorhis recognizes the impropriety of his comment to Mr. Alvear (count two A(3)). The masters explained that their conclusion of prejudicial conduct was based on how an “objective observer” would perceive the comment, and not on the judge’s intent or motivation. Judge Van Voorhis’s response, however, focused solely on his intent. His obliviousness toward appearances is also reflected in his letter of April 11, 2000, to the Contra Costa Public Defender in response to his letter complaining about the comment to Mr. Alvear. Despite knowing that the matter had been referred to the commission, Judge Van Voorhis commenced his letter with the sentence, “Why does it seem that whenever I go on vacation, the first day back at work is particularly difficult, wiping out the benefits of my relaxing time?” This opening, as well as his closing,[62] suggests that Judge Van Voorhis has little awareness of how his statements are reasonably perceived.
The inexperienced prosecutor in the McDonald case (count two A(4)) did nothing to provoke Judge Van Voorhis. She asked about the defendant’s probation status after the defendant denied that he had been convicted and after the defendant requested that the prosecutor repeat her question. When Judge Van Voorhis asked Ms. Meade where she had learned that a defendant’s probationary status was admissible, she apologized. Rather than accept the apology, Judge Van Voorhis impugned her motives (“And so were you just guessing what you could get away with in a courtroom?”).
Judge Van Voorhis does not admit that his comments were unethical. He argues that the potential prejudice from the prosecutor’s inquiry into the defendant’s probationary status was great and required the court’s immediate *CJP Supp. 306 intervention. The judge’s misconduct, however, was not his determination not to allow the inquiry, but his demeaning, rude and abusive behavior toward the prosecutor. Judge Van Voorhis’s failure to address the manner in which he acts suggests that he believes that as long as his subjective intent is proper there are no ethical limits on how he expresses himself.
Judge Van Voorhis also does not admit to any unethical conduct in his order that Ms. Brock admit to the jury that certain evidence “does not mean anything” (count two A(5)). He contends that he was protecting the defendant’s constitutional right to a fair trial. Again, the misconduct is not Judge Van Voorhis’s decision to exclude evidence of the gaze nystagmus test, but his demeanor and insistence that the prosecutor admit to the jury that she was wrong. By focusing solely on his subjective motive, Judge Van Voorhis fails to indicate any appreciation for ethical constraints on the manner in which he acts.
The gap between Judge Van Voorhis’s subjective intent and his actions also is reflected in his comments in the Elze matter concerning the relevance of evidence of the defendant’s drinking habits (count two A(6)). Although the defense counsel who initially proffered the evidence was not sure the evidence was really relevant, Judge Van Voorhis insisted that it was, and then insisted that the prosecutor, who had objected, admit that it was relevant. Before the masters and the commission, Judge Van Voorhis contended that he had sought to give the prosecutor an opportunity to object under Evidence Code section 352. There is nothing in the record to suggest that anyone in the courtroom, other than Judge Van Voorhis, could have been aware of the judge’s purported intent.
Although Judge Van Voorhis honestly may not recall throwing the files down, he might still have apologized for his demeanor toward Ms. Carmichael (count two B(l)). Instead, he has offered as defenses that Ms. Carmichael, a fill-in clerk, did not properly check his calendar for jury trials later in the week and that in the afternoon certain defendants were not properly directed to his court. He also argues that he did not know that the throwing of the files was the problem. However the testimony before the masters and Presiding Judge Simon’s letter indicate that when Judge Simon met with him, Judge Van Voorhis immediately provided him with his version of the events. Again, the issue was not Judge Van Voorhis’s intent, but his demeanor.
Judge Van Voorhis’s obliviousness to his demeanor is apparent in his response to the allegations in count two B(2) concerning his comments to Ms. Van Horn about swearing in the bailiff. After hearing all the testimony *CJP Supp. 307 concerning his demeanor, Judge Van Voorhis testified that he spoke to Ms. Van Horn in a “conversational tone.” In addition, Ms. Van Horn testified that when she and another clerk went back into the courtroom to show Judge Van Voorhis that the manual did not indicate how the bailiff should be sworn in, Judge Van Voorhis ignored them for approximately 15 minutes until they left, preferring to focus on an extended conversation he was having with a student. Judge Van Voorhis denies that he ignored them, but his testimony indicates that he was aware of their presence and chose not to acknowledge it.
Judge Van Voorhis never apologized to Deputy Brown for telling her in open court and before an incarcerated defendant that she needed to learn how to do her job (count two B(3)). Judge Van Voorhis never asked Deputy Brown why the inmate was not transported nor did he inquire why he had not been told that the inmate would not be transported. If he had, he would have learned that Deputy Brown had promptly told Judge Van Voorhis’s bailiff, Deputy La Fortune, and that Deputy La Fortune—whom Judge Van Voorhis announced would train Deputy Brown—had failed to tell the judge or to instruct Deputy Brown to tell the judge.
Judge Van Voorhis’s failure to appreciate the context in which he presides also is apparent from his comments to the juror in the Sowande case (count two C). Judge Van Voorhis carefully worked out his response to the jury’s question with counsel and gave counsel the option of having the jury return to the courtroom to hear the answer. He then decided—without consulting the attorneys and prompted apparently by some suspicion of defense counsel’s motives (which were never disclosed to counsel)—that he needed to give the jury some reason for being brought back into court and decided to chastise the jury for the lack of clarity in its question.
Finally, Judge Van Voorhis’s lack of appreciation of his misconduct is reflected in his testimony concerning his 1992 assurance to the commission that his misconduct would not be repeated. When questioned before the masters, Judge Van Voorhis could not say that he had given any such assurance.[63] This failure to remember his assurance suggests that Judge Van Voorhis either did not consider it important or did not think it was relevant to his more recent misconduct.
*CJP Supp. 308 4. Likelihood of Future Violations
The commission is of the opinion that it is not only likely, but close to a certainty that Judge Van Voorhis, if allowed to remain on the bench, will continue to violate the California Code of Judicial Ethics. This conclusion is compelled by Judge Van Voorhis’s failure to appreciate the inappropriateness and importance of his manner of acting, his defense to the allegations, his statements to the masters, his failure to present any evidence of steps taken to avoid future violations, and his oral presentation to the commission.
It is very difficult for a judge to avoid repeating an ethical violation unless he or she recognizes the act as misconduct. Of course, a judge may not have intended the violation or may not have initially recognized that the act constituted misconduct. In a disciplinary proceeding, however, a judge is well advised to maintain alternate defenses. First, the judge may, and should—if he or she so believes—maintain that the act was not a violation of the California Code of Judicial Ethics. Second, the judge should indicate that despite any lack of improper intent at the time, he or she now recognizes how the act could be perceived as unethical. Otherwise, should it ultimately be determined that the act was unethical, there may be serious concerns that the judge is likely to repeat the violation.
Judge Van Voorhis, while stoutly arguing that he has not engaged in any misconduct, has provided little evidence that he appreciates how the masters and the commission could find 11 instances of misconduct. Judge Van Voorhis does admit that he could have done some things better, but the commission perceives little appreciation of the factors that gave rise to this disciplinary proceeding. For example, Judge Van Voorhis has shown no awareness of how his comments to Ms. Brock (about his ruling to exclude evidence) and to Mr. Alvear (to lose the accent) could be perceived as unethical (even assuming his good intent). Instead of indicating that he will try to improve how he addresses staff, Judge Van Voorhis maintains that he *CJP Supp. 309 spoke to Ms. Van Horn in a “conversational tone.” Although Judge Van Voorhis maintains that he did not consciously belittle an attorney in front of the jury, there is little to suggest that in the future he would refrain from making comments in front of a jury.
The commission’s concern is supported by Judge Van Voorhis’s comments to the masters. While Judge Van Voorhis was being questioned concerning his comments to Ms. McMurray before the jury (count two A(2)), the following colloquy took place:
“JUSTICE HOLLENHORST: That position is also undermined however by the fact that, when you decide to query an attorney, that you do so in front of the trier of fact, which has the potential for diminishing this lawyer’s value or credibility in front of the trier of fact or the client. Isn’t that true?
“JUDGE VAN VOORHIS: It is. And again, what I feel has happened in the course of my career is that I think I show more of my feelings the longer I stay on bench. And I have to now factor that into my decision as to whether or not to conduct these discussions in open court in the presence of a jury, [f] Whether or not I simply fooled myself earlier in my career that these things weren’t being seen or whether I was oblivious to it or whether or not I really did at that time have better skills than I did at this phase—but what I hope to present to the Commission, to you folks, is that these experiences for me were pretty unusual. I was pretty astonished at the approach that’s being taken by these lawyers, [f] It’s not that I hadn’t ever seen it before, but it—I think it caused an unusual reaction. Not unusual for a human being, but I have expressed it the best I can.”
Judge Van Voorhis’s honest statement is tantamount to an admission that the longer he stays on the bench the more likely it is that he will lose control.[64] Furthermore, contrary to Judge Van Voorhis’s perception of the situation as “unusual,” both the masters and the commission found that Ms. McMurray did nothing to justify Judge Van Voorhis’s conduct.
Later in the proceedings, while trial counsel was examining Judge Van Voorhis concerning his meeting with Presiding Judge Simon, the following dialogue took place:
“MR. COYLE: I believe your response to Judge Simon, you said, T recognize the need to resolve this problem’; correct?
*CJP Supp. 310 “JUDGE VAN VOORHIS: Yes.
“MR. COYLE: What problem?
“JUDGE VAN VOORHIS: The problem he and I discussed is that people often misunderstand me. They don’t perceive really where I’m coming from, what I’m about, and what it means when I do what I do.
“MR. COYLE: So that’s the problem, people don’t understand you?
“JUDGE VAN VOORHIS: I think it would be easier for people to deal with me if they did understand me.
“MR. COYLE: But you don’t have a problem?
“JUDGE VAN VOORHIS: Understanding me?
“MR. COYLE: You don’t have a demeanor problem?
“JUDGE VAN VOORHIS: Are you asking me my opinion of whether I have a demeanor problem?
“MR. COYLE: Yes. Yes, I am.
“JUDGE VAN VOORHIS: I think that I’m special compared to other people in that category. And I—I don’t think it’s nice to use the word ‘special’ because it means that I’m not like other—the average person, not like the average person or other people in general in that category.
“MR. COYLE: Can you expound on how you’re special in that regard?
“JUDGE VAN VOORHIS: Well, I referenced my sleeve, I think.
“MR. COYLE: I’m sorry. You referenced what?
“JUDGE VAN VOORHIS: My sleeve. I think that my emotions are closer to the surface, so to speak, than other people’s are.
“JUSTICE HOLLENHORST: What does that mean?
“JUDGE VAN VOORHIS: That I don’t think that the behavior means the same for me as it does for you.
*CJP Supp. 311 “JUSTICE HOLLENHORST: Then you misunderstand or mistake signals from other people?
“JUDGE VAN VOORHIS: No. I think they mistake them—I think they mistake them from me. Because if they were to say to themselves, take what he is showing you and divide it by some number—say, two or ten—and then consider that’s what he’s displaying. And if you do that, maybe you understand better what it is that I’m trying to portray, what feeling I’m trying to portray in what I do because—you’ve heard of the phrase 110 percent. I think most of my life people have said that I try too hard and that, if I aimed at 80 percent, I would look pretty optimistic.”
Again, while Judge Van Voorhis is frank, his perspective suggests that further incidents will arise as he admits that he is emotional and that people misunderstand him, but he fails to take responsibility for controlling his emotions or being concerned with how he is perceived.
In light of Judge Van Voorhis’s admissions, one might have expected him to present some evidence of steps he had taken to control his feelings. However, the record contains only Judge Simon’s letter suggesting that Judge Van Voorhis take an anger management program for executives and indicating that Judge Van Voorhis declined the suggestion because he had “adequate private resources to draw on for this assistance.” There is no evidence that Judge Van Voorhis took any judicial education classes. There was no evidence, other than Judge Van Voorhis’s self-serving argument,[65] that he had changed his manner of addressing counsel or staff.
Any doubts that the commission may have had as to the likelihood of repetition were dispelled by Judge Van Voorhis’s oral presentation to the commission. Judge Van Voorhis argued that he was not like the commission members and was afraid of being “misjudged.”[66] He went on to argue that as long as he had a “good” subjective intent, the commission could not find that *CJP Supp. 312 he had proceeded in “bad faith,” and could not remove him from office.[67] Regardless of the legal merits of his argument, Judge Van Voorhis left the impression that he believed his good faith so mitigated his misconduct that he would not hesitate to commit similar ethical violations in the future as long as he was convinced in his own mind that he had a good intent.
5. Impact of Misconduct on the Judicial System
The fifth consideration concerns the impact of the judge’s misconduct on the judicial system. The commission agrees with the masters that Judge Van Voorhis’s misconduct not only compromises the appearance of the integrity of the judiciary, but actually interferes with the administration of justice. The masters noted that Judge Van Voorhis “in the various hostile exchanges with counsel not only demonstrated a lack of judicial temperament to counsel but jeopardized the parties’ right to a fair and impartial verdict based on only the evidence and not on sympathy for the attorney victim of the judge’s wrath or the offers of proof and speaking objections that the court routinely entertained in front of the jury.” The masters also noted that Judge Van Voorhis’s criticism of the jury’s question (count two C) “almost affected the outcome of the case because [the jury foreman] was so upset that he considered deciding the case on grounds other than the evidence.”
The commission further notes that Judge Van Voorhis’s misconduct, however it is characterized, seriously undermines the public’s confidence in and respect for the judicial system. The public looks to judges to set the tone of judicial proceedings. When a judge mistreats staff, belittles counsel or gives vent to his or her anger or frustration, the audience is not only *CJP Supp. 313 concerned about the result in the specific matter before the court, but worries that other parties, lawyers, jurors and employees will be subjected to similar mistreatment.
6. Mitigating Factors
In his briefs to the commission, Judge Van Voorhis offered as a mitigating factor his good judicial character as attested to by the attorneys who came forward on his behalf. Other possible mitigating factors are Judge Van Voorhis’s industriousness and efficiency as a judge, his intensity and his years on the bench.
The commission respectfully finds little weight in these factors. Of the eight attorneys who came forward on Judge Van Voorhis’s behalf only five had tried more than one case before the judge. These five related that Judge Van Voorhis was extremely hard working and efficient.[68] They did not volunteer their opinions as to the judge’s demeanor, and when asked, their responses were qualified [69] The testimony of the only judge other than Judge Van Voorhis to appear in the proceedings did not support Judge Van Voorhis.[70]
Judge Van Voorhis’s intensity and his years on the bench weigh against him as much as in his favor. His intensity may have contributed to his reputation for being hard working and efficient, but it also appears to have contributed to his impatience and his inability to appreciate the perspectives of others. The fact that Judge Van Voorhis is a seasoned judge might be a mitigating factor were there only one or two instances of misconduct. Where, however, there is a pattern of misconduct following prior discipline, the judge’s persistence suggests that he is unlikely to correct his behavior.
C. Removal Is the Appropriate Discipline
Judge Van Voorhis contends that because his intent was always to do justice, the commission cannot make a finding of “bad faith” and hence his *CJP Supp. 314 misconduct cannot be characterized as “willful misconduct” and the commission cannot remove him from office.
As a matter of law, this argument is incorrect. The California Constitution clearly authorizes the commission to remove a judge for “conduct prejudicial to the administration of justice that brings the judicial office into disrepute.”[71] In 1973, when the Supreme Court was first flushing out the differences between “willful misconduct in office” and “conduct prejudicial to the administration of justice that brings the judicial office into disrepute,” it noted: “It should be emphasized that our characterization of one ground for imposing discipline as more or less serious than the other does not imply that in a given case we would regard the ultimate sanction of removal as unjustified solely for ‘conduct prejudicial to the administration of justice which brings the judicial office into disrepute.’ ”[72] In McCullough, the Supreme Court, citing Geiler, reiterated that prejudicial conduct, although “less grave” than willful misconduct, “may nevertheless, by itself, justify removal.”[73]
The more difficult question is whether Judge Van Voorhis should be removed from office for what he calls violations of demeanor. The commission concludes that Judge Van Voorhis should be removed from office.
First, it may well be that Judge Van Voorhis did not set out to violate the California Code of Judicial Ethics. Nonetheless, the record shows that on at least four instances he lost his temper and vented his anger or frustration in ways that compromised the administration of justice and the integrity of the judiciary. The “fact” that a judge does not intend to lose his or her temper does not excuse the judge from taking responsibility for what the judge says or does when angry or frustrated.
Second, the four instances of bad faith and seven instances of prejudicial misconduct are much more than just poor demeanor. They present a pattern of abuse of authority, embroilment and appearances of impropriety. In addition, in several instances the masters found witnesses’ testimony more credible than Judge Van Voorhis’s contrary testimony.
*CJP Supp. 315 Third, prior discipline and warnings have not resulted in Judge Van Voorhis modifying his behavior. Judge Van Voorhis was previously publicly reprimanded for similar misconduct and was again warned verbally and in writing by his presiding judge that he continued to have a demeanor problem.
Fourth, Judge Van Voorhis’s misconduct not only compromises confidence in the integrity of the judicial system, but also potentially interferes with the administration of justice and hurts people. Jurors heard inadmissible evidence, attorneys’ credibility was improperly compromised in front of juries, and at least one juror considered not deciding a case on the evidence because of the judge’s insult. Also attorneys, staff members and jurors were humiliated.
Fifth, as noted, Judge Van Voorhis does not appear to recognize how the way he speaks and acts violates the California Code of Judicial Ethics. The thrust of his defense in this proceeding has been that he meant no harm and that others misunderstand him.
Sixth, (1) because Judge Van Voorhis does not understand his misconduct, (2) because he has not presented any evidence of steps taken to learn about his misconduct or to control it, (3) and because he frankly admitted that the longer he is a judge the more likely it is that he will “show his emotions,” the commission is convinced that Judge Van Voorhis will continue to violate the California Code of Judicial Ethics if he is allowed to remain on the bench.
In its opinion removing Judge Wenger from office, the Supreme Court noted: “There is no evidence that he neglected his work or used his office for illicit gain. As the master observed, ‘his fault lay more in his over-zealous performance of his duties.’ Petitioner candidly admitted he had a ‘bull headed approach’ and was ‘more concerned about substantiating [his] contentions in a matter than being correct.’ ”[74] The court further noted that in his final testimony before the masters, Judge Wenger was “laudably contrite.” “At last he saw that the reasons for his making and repeating many mistakes lay in himself and in ‘that part of my personality that has blinded me to the realization that I’m not right. I’ve striven to support my position without realizing that there is more to it.’ ”[75] The court, however, determined that mitigation of wrongdoing “requires more than an unfulfilled intent to reform,” and concluded that as the aim of the disciplinary proceeding was not *CJP Supp. 316 punishment but “ ‘to protect the judicial system and the public which it serves from judges who are unfit to hold office,’ ” faithfulness to that aim required removal.[76]
There is no evidence that Judge Van Voorhis “neglected his work or used his office for illicit gain.” Judge Van Voorhis’s own testimony before the masters and the commission suggests a zealous, if not overzealous, performance of his duties. However, unlike Judge Wenger, Judge Van Voorhis has failed to explicitly accept responsibility for bis misconduct.
The commission concludes that the record in this case—as did the records in Kloepfer and Fletcher—demonstrates “ ‘an inability to appreciate the importance of, and conform to, the standards of judicial conduct that are essential if justice is to be meted out in every case,’ ” and does not suggest that Judge Van Voorhis “ ‘has, or will be able to, overcome [his demonstrated lack of judicial temperament] and that similar incidents will not recur.’ ”[77]
The commission is mindful of the impact of its determination on Judge Van Voorhis, but its mandate directs the commission not to focus on punishment, but on the protection of the public, the enforcement of rigorous standards and maintenance of public confidence in the integrity of the judiciary.[78] In light of the evidence of misconduct, the judge’s prior discipline, the judge’s lack of appreciation of his misconduct and the likelihood of repetition, faithful adherence to this mandate compels that future parties, staff employees and attorneys not be subjected to Judge Van Voorhis’s misconduct. In reaching this conclusion the commission notes that the Supreme Court has removed judges from the bench for conduct that did not rise to the level of moral turpitude, dishonesty or corruption [79]
*CJP Supp. 317 CONCLUSION
The commission has found that Judge Van Voorhis committed four acts of willful misconduct and seven acts of prejudicial misconduct. Judge Van Voorhis seeks to minimize his misconduct by characterizing it as a demeanor problem, but his “demeanor problem” is much more than being impolite. It includes such “demeanor" misconduct as loss of judicial temperament, abuse of authority and embroilment. The commission has found that this misconduct occurred after the judge had been publicly reproved for similar conduct, and had received a separate private admonishment. Furthermore, all but two of the incidents occurred after an incident which reminded Judge Van Voorhis of his public reproval and caused his presiding judge to meet with Judge Van Voorhis and warn him that his misconduct must not be repeated. The commission has also found that Judge Van Voorhis does not appreciate the inappropriateness of his misconduct and that there is a strong likelihood that if he is allowed to remain on the bench he will commit future violations of the California Code of Judicial Ethics. These conclusions are compelled by Judge Van Voorhis’s frank admission that the longer he is on the bench the more difficult it is for him not to lose his temper, and by his failure to recognize that his subjective good intent does not allow him to abuse his authority, become embroiled in matters or lash out at employees or attorneys. Finally, the commission finds that Judge Van Voorhis’s misconduct not only brings the judicial office into disrepute, but has also interfered with the administration of justice in particular cases. In sum, the record demonstrates “ ‘an inability to appreciate the importance of, and conform to, the standards of judicial conduct that are essential if justice is to be meted out in every case.’ ”[80] Accordingly, the commission cannot, consistent with its mandate to protect the public, enforce rigorous standards of judicial conduct, and maintain public confidence in the judiciary, allow Judge Van Voorhis to continue on the bench.
This decision shall constitute the order of removal of Judge Bruce Van Voorhis and, pursuant to the provisions of article VI, section 18 of the California Constitution and rule 120(a) of the Rules of the Commission on Judicial Performance, Judge Bruce Van Voorhis is hereby disqualified from acting as a judge.
Commission members Judge Rise Jones Pichon, Ms. Lara Bergthold, Judge Madeleine I. Flier, Mr. Michael A. Kahn, Mrs. Crystal Lui, Mrs. Penny Perez, Ms. Barbara Schraeger, and Dr. Betty L. Wyman voted in favor of all the *CJP Supp. 318 findings and conclusions expressed herein and in the removal of Judge Bruce Van Voorhis from judicial office. Commission members Justice Vance Raye and Ms. Ramona Ripston dissent in part from the commission’s decision. Commission member Mr. Marshall Grossman did not participate in this matter.
Commission member Justice Vance W. Raye expresses the following opinion.
I concur with my colleagues on the essential principles of judicial decorum that should guide our decision in this case. Rudeness, arrogance, and nastiness have no place in the courtroom. The increasing lack of civility among lawyers is a frequent topic of legal commentaries; judicial incivility is no less reprehensible. A judicial appointment is not a license to insult and demean. Indeed, judges, who are shielded from intemperate attorneys by rules of attorney discipline and the contempt power, should set the standard for courtroom demeanor and conduct. On those principles there can be little disagreement. Our task, however, is not to compose ethical maxims but to apply them. Ultimately, we must determine whether respondent’s actions can be properly characterized as misconduct and, if so, must decide on an appropriate sanction.
Clearly, not every discourteous act constitutes willful misconduct, and not every act of misconduct warrants the ultimate sanction of removal. Indeed, the extreme sanction of removal is appropriate only if essential to public protection. I differ with the majority’s characterization of certain acts committed by Judge Van Voorhis. Those differences, however, are of relatively minor significance. Of greater importance is my conviction that respondent’s actions, no matter how characterized, do not warrant the extreme sanction of removal from office. For that reason, I must respectfully dissent.
Despite our disagreements, my colleagues and I share a common perception of respondent based on the record and his presentation to the commission: Judge Van Voorhis is not a warm and fuzzy individual. His sharp edges are plain and visible and he makes no effort to conceal them. He speaks his mind with bluntness and candor and appears to be neither ingratiating nor endearing. This should not matter. Affability is not a qualification of judicial office. We have not been empowered to cull the judiciary of persons who lack congeniality; that discretion is left to the appointing power, in the first instance, or the voters who may express a preference for a more likeable candidate. Our power is tethered to the judge’s conduct, not his personality.
*CJP Supp. 319 The judge’s conduct here can be summarized thusly. Following trial in People v. Elze, respondent made comments to a young prosecutor that created the impression his earlier decision on a legal issue was not based on the merits but was calculated to teach the new lawyer how to handle adversity. During trial in People v. Silva, respondent excoriated an inept attorney in a voice that was condescending, disrespectful, and contemptuous. In People v. Gotchall, he again adopted a hostile and condescending tone in reprimanding a young district attorney for what he perceived to be an effort to circumvent his evidentiary ruling concerning the horizontal gaze nystagmus test.[81] The judge’s understanding of the evidentiary foundation necessary for introduction of the horizontal gaze nystagmus test was also the source of friction in People v. Elze [82] Again, the judge made a ruling and perceived an effort by the prosecutor to circumvent the ruling. He angrily objected to the prosecutor’s questioning and instructed her to tell the jury to disregard the answer. In a separate case involving the same prosecutor, he disagreed with the prosecutor’s objection on an evidentiary matter and instructed her, in front of the jury, to agree with his ruling. In People v. McDonald, respondent again undertook to teach a young prosecutor rules of evidence, interrupting and questioning her in front of the jury in a manner that could only be described as demeaning and sarcastic. Following the trial of People v. Hoye in January 2000, respondent volunteered to the young public defender trial deputy that his accent was charming but he should “lose it.”
In three other matters involving court staff, respondent is accused of throwing files in a fit of anger, with some of the files landing on a clerk’s workspace; castigating a clerk in front of a jury for wasting the court’s time; and chastising a deputy sheriff for not knowing her job, though his criticism was not warranted and her conduct could have been explained had he only asked. In a single matter involving a jury, he criticized members of the jury for the wording of a question they submitted, telling them, “you could improve on your English, and therefore your question could be way more precise for me.” Some jurors felt insulted by the comment.
*CJP Supp. 320 There is no doubt that respondent was intemperate in his remarks and his actions, that the objects of his tirades were embarrassed and humiliated, and that many of his words should have best been left unsaid. Respondent’s regrettable conduct speaks for itself. For that reason, I offer a mild dissent from efforts to amplify the seriousness of respondent’s lapses in regard to his angry outbursts at counsel by labeling them as “willful misconduct.” According to the majority, a judge’s “lashing out at counsel” constitutes bad faith under two of the three tests for bad faith articulated by the Supreme Court: First, according to the majority, comments made to vent anger or frustration cannot be said to have been made in the “faithful discharge of judicial duties” and thus were made for a “corrupt purpose.” Second, because respondent had recently been cautioned about his demeanor, his subsequent loss of poise evinced a “conscious disregard for the limits of the judge’s authority.”
I am not persuaded by either of these justifications. Certainly the conduct here is no worse than the judge’s conduct in Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297 [267 Cal.Rptr. 293, 787 P.2d 591] (Kennick). There, the commission found the judge screamed in an abusive manner at an attorney in open court when she attempted to make a bail motion and screamed at her again in chambers when she suggested the court reassign counsel in certain cases to expedite the calendar. Further, the commission found that the yelling so intimidated the attorney that she felt she could never make another bail motion before petitioner, and the yelling in chambers frightened her and reduced her to tears. The masters concluded this conduct constituted prejudicial conduct; the commission concluded it constituted willful misconduct. The Supreme Court concluded it was only prejudicial conduct, declaring, “The evidence does not establish clearly and convincingly that the acts in question were committed for a purpose other than the faithful discharge of judicial duties and thus amounted to more than spontaneous outbursts.” (Kennick, supra, 50 Cal.3d at p. 326.) Perhaps our respondent’s outbursts were more protracted, but they were spontaneous in origin and derived from the same motivation—anger and frustration.[83]
I also do not agree that respondent’s comments to the jury constituted misconduct. As our Supreme Court has suggested, “It is sometimes difficult to determine the line between ‘extremely poor taste’ and ‘conduct prejudicial to the administration of justice that brings the judicial office into disrepute.’ ”[84] Jurors are the lifeblood of the court system. Performing a civic duty for a pittance, they should be praised, not ridiculed. Nevertheless, I do not *CJP Supp. 321 believe respondent crossed the line. He lacks courtside manners, but his request of the jury to be careful in crafting their questions is not an actionable offense. The fact the jury foreman “was so upset that he considered deciding the case on grounds other than the evidence” is regrettable—jurors are sworn to render a verdict according to the evidence—but it does not support a finding of misconduct.
I will make no further effort to defend respondent’s conduct. It is largely indefensible. The ultimate question—the question that really matters—is whether respondent’s conduct, no matter the labels affixed to it, warrants removal from office. Regrettably, questions of penalty cannot be answered with scientific precision. There are no sentencing guidelines for us to follow, no mandatory sentencing laws or three strikes laws applicable to judges. But we are not without guidance. According to the Supreme Court, the sanction of removal is invoked when necessary for “the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.”[85] Our task is not to punish but “ ‘to determine the nature of the discipline, if any, that is necessary to achieve these goals.’ ”[86]
Obviously, what is necessary to protect the public from boorish behavior is different from what may be necessary to protect the public from corrupt decisionmaking based on friendship,[87] a persistent pattern of ex parte contacts and alteration of court records,[88] persistent failures to perform duties in a diligent fashion,[89] accepting gifts from litigants,[90] abuse of the contempt power,[91] prejudgment of cases,[92] or interfering with the conduct of a commission investigation.[93]
*CJP Supp. 322 Certain conduct is so egregious that even a single instance warrants the severest of sanctions. For example, a judge who accepts a single bribe arguably poses too great a risk to the public and to public confidence in the integrity and independence of the judiciary to be permitted to continue in office. The same cannot be said of intemperance because intemperance can take so many forms and vary in degree. Perhaps that explains why there are no cases removing a judge from office based solely on demeanor violations.[94] This is not to suggest that there will never be a case warranting removal based on outrageous demeanor. This is simply not an appropriate one.
A review of the 14 removal cases published since 1960 confirms this assessment. Of those 14 cases, eight included allegations of intemperate conduct. In Fletcher, supra, 19 Cal.4th 865, the judge engaged in a pattern of ex parte contacts (six counts), prejudged evidence, altered court documents, entered judgment without notice to the parties, and used a photograph of staff for campaign purposes without their consent. The accusation also included a demeanor allegation (berating an attorney in open court: “ ‘She shouldn’t be handling criminal cases’ “ ‘[She] probably had something more important to do today, like go to a PTA meeting’ “ ‘She has a whole bunch of kids. She’s been having kids ever since I’ve known her,’ ”[95] but it hardly mattered given the weight of the other misconduct.
Kennick, supra, 50 Cal.3d 297 is an interesting case where the judge was removed from office for failure to perform the duties of office. However, he was charged with a multitude of other violations. Among other things, he was found to have been rude and abusive to officers who arrested him for driving under the influence (DUI) and thereafter sought preferential treatment in the investigation of the DUI charge. It was also alleged that he treated attorneys with disrespect. In addition to yelling at a prosecutor, detailed ante, the judge also argued with another deputy district attorney who objected to being addressed as “ma’am” and ordered her “ ‘not to come in here again,’ ” to which she responded, “ ‘Thank you very much. That’s a privilege.’ ” Given the mutual nature of the combat, the Supreme Court disagreed with the determination of prejudicial conduct and ordered the charge dismissed. However, the court concluded the judge had committed prejudicial conduct in addressing female attorneys and others appearing before him as “sweetie,” “sweetheart,” “honey,” or “dear” and in treating both criminal defendants and *CJP Supp. 323 witnesses rudely and with disrespect—interrupting them, yelling at them, and speaking in demeaning tones. Multiple examples were given.[96]
Nevertheless, while the court found multiple instances of prejudicial conduct and one of willful misconduct based on demeanor and other allegations, in determining whether removal was appropriate, the court concluded: “All this judicial misbehavior by petitioner, though deplorable and clearly calling for censure, falls significantly short of the showings of willful misconduct and prejudicial conduct on which we have based orders removing judges.”[97] In brief, the fact that the judge was “demeaning, rude, impatient, and abusive,” “addressed women in the courthouse . . . with undue and demeaning familiarity” and “[t]wice . . . yelled at and unjustly intimidated a deputy city attorney, and on another occasion . . . imparted similar treatment to a deputy district attorney” did not warrant removal. (Kennick, supra, 50 Cal.3d at p. 339.)[98]
Kloepfer, supra, 49 Cal.3d 826 is another case in which allegations of poor demeanor are part of a mix of findings that include four acts of willful misconduct and 21 acts of prejudicial conduct. In addition to a “persistent pattern of rude, abusive, and hostile behavior” that makes Judge Van Voorhis seem angelic, Judge Kloepfer persistently abused the contempt power, threatening and finding attorneys and parties in contempt with recldess abandon, and became embroiled in the cases to the point of refusing to dismiss prosecutions on the People’s motion based on his personal perception of the defendants’ guilt and raising bail in another case based on his view the defendant was “ ‘fraudulent, a liar, and deceitful.’[99] There is no comparison between the scope and nature of the charges in Kloepfer and those involved here. The 18 charges of willful misconduct and two of prejudicial conduct in Gonzalez, supra, 33 Cal.3d 359 also do not resemble the charges in the present proceeding. Judge Gonzalez used his judicial office to intercede in criminal matters on behalf of friends, acted improperly on bail releases, impugned the character of his judicial colleagues, made ethnic and racial slurs, and generally conducted himself and his courtroom in a manner befitting a television comedian. Even more egregious than Gonzalez was the case of Cannon, supra, 14 Cal.3d 678, where the judge engaged in 21 acts of willful misconduct and eight acts of prejudicial conduct involving actions that the Supreme Court has described as “bizarre.” In Wenger, supra, 29 Cal.3d 615, the court sustained 10 charges of willful misconduct in nine separate *CJP Supp. 324 incidents, including failure of the judge to disqualify himself, abuse of the contempt power, and retaliating against a prosecutor by banishing her from his courtroom because he suspected she had spoken with the commission regarding his judicial performance. Spruance, supra, 13 Cal.3d 778, like Wenger, is another case in which findings of intemperance are overshadowed by findings the judge attempted to influence the disposition of a case against a friend, acquitted a defendant who was the son of a friend and political supporter, reduced a traffic charge against the nephew of a friend and later, in another case involving the same defendant, ordered his own recognizance release to prevent him from being arrested on an outstanding warrant. The judge also solicited another judge to dismiss a traffic citation against him and altered the records to create the impression the dismissal was based on attendance at traffic school.
The one removal case that seems faintly comparable to the present one is Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270 [110 Cal.Rptr. 201, 515 P.2d 1], in which a judge was removed for bringing the judicial office into disrepute. Judge Geiler, however, did not confine his misconduct to words. He invited a deputy public defender into chambers, produced a battery-powered dildo, and proceeded to thrust the object in the area of the attorney’s buttocks. Later, during the attorney’s cross-examination of a witness in open court, the judge suggested the dildo might be used to speed up the public defender’s cross-examination, a suggestion that the Supreme Court concluded was made with the intent of curtailing cross-examination. Judge Geiler appeared obsessed with sex and public defenders. He used crude, vulgar, and profane language in conversations with court personnel and female attorneys. As to the public defender, the court concluded he arbitrarily and capriciously removed the public defender from cases.
I cite previous removal cases with a full understanding of their limited utility. While some light is shed by precedent, each case we consider is singular and must be decided on the unique facts presented. Still, the fact respondent’s conduct in this case is so much less egregious than the conduct in other cases in which demeanor served as the basis for removal should give us pause.
So also a review of cases in which we have imposed censure is instructive. In Roberts v. Commission on Judicial Performance (1983) 33 Cal.3d 739 [190 Cal.Rptr. 910, 661 P.2d 1064] (Roberts), Judge Roberts was censured after he became visibly angry when told by an attorney that the attorney intended to petition the Court of Appeal for review of the judge’s ruling, telling the attorney that he was “ ‘chicken to take the case to trial.’ ” He poked the attorney in the chest with his finger and told him, “ ‘Buddy boy, you’re not *CJP Supp. 325 going to get away with this,’ ” further stating, “ ‘I’m going to see that you lose this case big.’ ” When the attorney protested the threat, petitioner replied, “ ‘I’ll threaten you anytime I feel like it.’ ” He later had ex parte conversations with the attorney on the other side and, after the Court of Appeal reversed his ruling, called the presiding justice and engaged in an angry diatribe. Further, the commission found that in a child neglect proceeding, Judge Roberts “ ‘improperly acted as an advocate, prejudged issues, abusively curtailed the presentation of evidence, and treated witnesses, litigants and an attorney in a rude, intimidating and demeaning manner.’ ” The Supreme Court did not review the evidence in detail but noted some examples: In response to an objection by counsel, the judge replied, “ T don’t care whether you object to it or not.... I will hear no further objections of this kind, do you understand, Miss [M.]?’ ” In response to a statement by a minor’s mother, he admonished: “ ‘If you have anything to offer you are going to be sworn. You have no credibility with this court. When you are sworn, let alone volunteer statements, ... I don’t believe a word you have testified to in this courtroom.’ ” He demonstrated similar impatience towards another witness, interrupting testimony in midsentence and stating: “ ‘You may step down. I wouldn’t believe you under oath. I don’t want any more testimony like this. This witness doesn’t know in one breath, and in the next breath it makes no difference. She would have [the mother], who had abused her own child, baby sit hers. Now, I don’t have to listen to that kind of evidence.’ ”[100]
And that is not all. Judge Roberts also displayed impatience with a young, inexperienced counsel. During a recess, “he accused her of being incompetent to represent the defendant, and rudely quizzed her regarding her legal experience. As a result of petitioner’s loud and angry manner, Miss A. began to cry and left the conference . . . ,”[101] Finally, Judge Roberts was convicted of violating section 148 of the Penal Code (resisting, delaying, or obstructing a public officer) based on his interference with uniformed California Highway Patrol officers who stopped a car being driven erratically by the judge’s son.
Censure was also considered an appropriate sanction in In re Stevens (1982) 31 Cal.3d 403 [183 Cal.Rptr. 48, 645 P.2d 99] (Stevens), which involved the conduct of a judge who remarked to counsel that Black persons have to learn how to live in their own neighborhoods and that it was “typical” of Black persons to fight unfairly. During his term in office, the judge frequently referred to Black persons as “ ‘Jig, dark boy, colored boy, nigger, coon, Amos and Andy, and jungle bunny.’ ”[102] The commission recommended censure in In re Gordon (1996) 13 Cal.4th 472 [53 Cal.Rptr.2d 788, 917 P.2d 627]. *CJP Supp. 326 There, the judge had repeatedly made sexually suggestive remarks to and asked sexually explicit questions of female staff members, referred to a staff member using crude and demeaning names and descriptions and an ethnic slur, referred to a fellow jurist’s physical attributes in a demeaning manner, and mailed a sexually suggestive postcard to a staff member.
Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (Dodds) is another censure case worthy of mention. Judge Dodds was found to have failed to report a law violation by a colleague and to have suggested to his staff that they also refuse to cooperate. More relevant to the present case, it was also determined that Judge Dodds on several occasions engaged in rudeness and prejudgment in the handling of cases and on one occasion spoke insultingly of two lawyers who had appeared before him. His rudeness included interrupting and yelling loudly and angrily at counsel and a litigant, as well as telling a joke that suggested bias. The Supreme Court concluded one of the offensive remarks was outside the statute of limitations and could not be considered and determined the remaining allegations did not support censure. Noting the judge had won praise from the bar and approval of the electorate, the court concluded public censure would not further the purpose of judicial discipline. The commission’s recommendation thus was rejected. Declaring, “Cases in which we have publicly censured judges involve conduct more serious than that involved here,”[103] the court cited a long list of censure cases, some of which in my estimation involved conduct more serious than the conduct here under consideration. Thus, in Fitch v. Commission on Judicial Performance (1995) 9 Cal.4th 552, 556 [37 Cal.Rptr.2d 581, 887 P.2d 937] the judge told a court reporter, “ ‘Your butt looks good in that dress,’ ” and also said, “ T certainly hope you’re not that frigid at home with your husband.’ ” For good measure, the judge slapped or patted a court reporter and a court trainee on their buttocks.
Another factor in deciding an appropriate sanction is our assessment of the likelihood that the judge will reoffend. The majority decision indicates it is not merely likely, it is “close to a certainty.” The near certainty is inspired by respondent’s testimony before the masters and before the commission. The import of his testimony, according to the majority decision, is that respondent presents himself as well meaning but “misunderstood” and refuses to take responsibility for his actions or the problems created by them. The decision quotes liberally from colloquies between respondent and participants in these proceedings to make the point that respondent remains unremorseful; inasmuch as reform begins with repentance, Judge Van Voorhis is incapable of reform.
*CJP Supp. 327 I would be persuaded by this logic had the evidence against the respondent been undisputed and the heinousness of his conduct conceded. Certainly, in all cases, respondents before the commission would be well advised of the value of contrition. However, a respondent is entitled to present a defense notwithstanding the unfavorable findings of the masters. Judge Van Voorhis appeared before the commission to dispute certain evidence and to explain his conduct. I do not regard his statement that he is often misunderstood as the ranting of a petulant adolescent attempting to evade responsibility for his actions. Respondent is simply acknowledging that he is hard and tough and crusty and becomes more so with age—but that beneath that exterior he attempts to be fair and compassionate. Despite his best efforts, he at times crosses the line. We have correctly rejected this plea as a defense. But it should not be viewed as a matter in aggravation. I do not begrudge respondent for his clumsy and ultimately unsuccessful effort to persuade us that he should be forgiven. He is simply explaining why conduct that comes naturally to some of us can be an effort for him.
I respect the opinions of my colleagues. Their assessment of respondent is probably correct in certain respects. Judge Van Voorhis will likely always be testy and somewhat ill humored. Perhaps charm and geniality will not be his hallmark. But that is not an appropriate measure of his prospects for reform and future judicial temperance. Judicial temperance is not the ability to ingratiate but the ability to keep the pressures of the moment from overpowering judicial composure. The question is whether he can conform his conduct to what is expected of him by the California Code of Judicial Ethics as construed and applied by this commission and by the Supreme Court. I am persuaded that he can. It would be nice if we had a greater array of sanction options—suspension, probation, compulsory education programs-—to provide greater assurance.[104] I understand that my colleagues believe censure is too weak a sanction. I believe removal is too great.
Commission member Ms. Ramona Ripston expresses the following opinion.
Like Justice Raye, I believe that the removal of Judge Van Voorhis from his judicial office is too harsh an action. I, too, would find censure more than adequate for his misdeeds. Judge Van Voorhis’s conduct does not, as Justice Raye so ably points out, represent the type of behavior for which the ultimate sanction is warranted. In short, I fully join in Justice Raye’s separate statement dissenting from the commission’s decision and order.
*CJP Supp. 328 I write separately only to note that, while the precedent Justice Raye cites makes it clear that the discipline imposed on Judge Van Voorhis is excessive, we have come a long way from some of the attitudes reflected in several of the earlier cases and I would not want our examination of them to suggest an endorsement of each and every result. Times have changed and so have our standards. For example, I believe that the conduct that led the California Supreme Court to censure Judge Stevens a generation ago would today unquestionably demand his removal. In my view, in a number of areas including race and gender bias, we should hold our judiciary to a higher level of conduct than we did on some occasions in the past. (I hasten to add that Judge Van Voorhis was guilty of no such offense.) Still, all in all, our precedent retains a certain value and wisdom, and I would not abandon it as completely as my colleagues in the majority appear willing to do. More particularly, I would reserve the sanction of removal for jurists whose misconduct is more willful and egregious, and constitutes a more central affront to the judicial function.
The judge’s petition for review was denied September 10, 2003.

 Ms. Brock sought to introduce evidence that Mr. Elze initially stated, “All I had to drink was coffee and water,” but then stated he had been drinking “brandy and 7-Up.” Mr. Elze later testified that he told the police he had been drinking “brandies and seven” and admitted having had two brandies and an Irish coffee.

 Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1092 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman), quoting Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 312 [45 Cal.Rptr.2d 254, 902 P.2d 272] (Doan).

 Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 878 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams), citing Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 284 [110 Cal.Rptr. 201, 515 P.2d 1] (Geiler).

 Doan, supra, 11 Cal.4th 294, 312.

 Doan, supra, 11 Cal.4th at page 325.

 Adams, supra, 10 Cal.4th at page 878, citing Gonzalez v. Commission on Judicial Performance (1983) 33 Cal.3d 359, 376 [188 Cal.Rptr. 880, 657 P.2d 372] (Gonzalez).

 A review of the transcript of the trial and the transcript of the hearing before the masters suggests that Judge Van Voorhis knew that his ruling was problematic. When the prosecutor cited the leading case, Berkemer v. McCarty (1984) 468 U.S. 420 [82 L.Ed.2d 317, 104 S.Ct. 3138], in the argument on defendant’s motion in limine, Judge Van Voorhis responded, “I don’t have to tell you which case controls or not.” Before the masters, Judge Van Voorhis testified that he excluded the testimony because he thought Mr. Elze was subject to arrest for evading the officers and the officer didn’t ask Mr. Elze whether he had been drinking. The record, however, indicates that Mr. Elze, either voluntarily or in response to the officer’s question, stated that he had “two brandies and an Irish coffee.” There is nothing in the record to indicate that the police officer thought Mr. Elze was subject to arrest for evasion.

 Judge Van Voorhis made statements such as, “That’s not the way to prove a case in criminal court. Didn’t you learn that in law school?”; “You learned what hearsay was in law school”; and “Now you need to ask him the question that you learned in law school is a legitimate question.”

 The masters’ report cites the following exchange.
“MS. McMUKRAY: If this was in the police report, and I indicated there was no motion indicating that this was to be excluded from this trial—
“JUDGE VAN VOORHIS: Let me interrupt. Case law says you can prove gaze nystagmus if you can bring an expert who can show a jury that it has some scientific basis, and you told me you are not prepared to do that.
“MS. McMURRAY: Not at this time.
“JUDGE VAN VOORHIS: So then you have no business even going into the topic because you can’t complete it. You can’t show that it’s reasonable. And so even going down that road is wrong because you know that you’re not going to finish going down that road.
“MS. McMURRAY: No, your Honor.
“JUDGE VAN VOORHIS: And you leave the jury with half the information they need in order to use that information.
“MS. McMURRAY: It was not my intention to do that, Your Honor. I have qualified officers in prior trials in different courts to testify on gaze nystagmus, so it wasn’t my intention to start something that I could not finish. This is the first time I’ve had a Court—
“JUDGE VAN VOORHIS: They are usually not in a position to tell us what it means. They can only tell us what their experience has been. But, like I say, it’s like the little finger. It doesn’t necessarily mean they are right.
“MS. McMURRAY: Fine. [$...[!]
“JUDGE VAN VOORHIS: And she is not in a position to know what experts say about this and what the field says about it. She only knows her own opinion about it.
“MS. McMURRAY: If I can ask her her own opinion about it, that’s—
“JUDGE VAN VOORHIS: No more admissible than her opinion about a little finger. It could be entirely coincidental, and you need to show it’s based upon the logic. How will we ever get there? The eyeballs do something, and this jury is supposed to assume that magically the officer can tell that it means something? H] And you are leaving them with the impression that the officer can and that you think this can be done, and I don’t—I just don’t think you ought to go there unless you are going all the way there.
“MS. McMURRAY: If that’s the Court’s opinion—
“JUDGE VAN VOORHIS: I’ve seen this before many times.
“MS. McMURRAY: —I have never heard of it.
*CJP Supp. 271 “JUDGE VAN VOORHIS: If you do gaze nystagmus, you have to have an expert. That’s what the Court of Appeals [szc] has said, [ft] If you don’t produce the expert, you can’t open the topic because it leaves these people with the impression that it’s got some sort of scientific basis and they ought to give it some weight, [ft] I can instruct them to give it no weight whatsoever, just like the little finger—
“MS. McMURRAY: That’s fine.
“JUDGE VAN VOORHIS: —and make fun of it and ridicule it to the point they will disregard it. [In a footnote, the masters noted, ‘At this point in the proceedings, Ms. McMurray was concerned that the judge’s proposal to make fun and ridicule her evidence would result in a devastating blow to her case.’]
“But suppose they are not able to do that—
“MS. McMURRAY: If Your Honor wants to instruct them on this one test, that’s fine, Your Honor. It was only one piece of the entire field sobriety test she gave the defendant.
“JUDGE VAN VOORHIS: You are not able to offer sufficient scientific evidence to support gaze nystagmus in a court of law?
“MS. McMURRAY: I have this officer present here.
“JUDGE VAN VOORHIS: This officer probably will not qualify. I’ll let you go down that road, but if you keep pursuing it and try to qualify her and she doesn’t qualify, and you have wasted a lot of time, and I may have to take the jury away from you because you leave them with the impression that it means something, [ft] You can’t start off leaving them with the impression that it means something and then never tell them what it means, [ft] This officer probably will not qualify as an expert in the field of gaze nystagmus.
“MS. McMURRAY: So, Your Honor, you have given me two options. One is continue and waste time or, two, is give the jury an instruction, so I’m not going to do something that the Court is telling me not to in a convoluted way.
“JUDGE VAN VOORHIS: Right, you would only waste more time.
“MS. McMURRAY: That’s correct.
“JUDGE VAN VOORHIS: You’re only asking to waste more time.
“MS. McMURRAY: I don’t want to waste the Court’s time.
“JUDGE VAN VOORHIS: Exactly. So aren’t we ready now to find out whether the jurors can follow my instruction or not and then we will abandon this topic?”

 Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 914 [81 Cal.Rptr.2d 58, 968 P.2d 958] (Fletcher). See also Furery v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1304 [240 Cal.Rptr. 859, 743 P.2d 919] (Furey) (“We do, however, give special weight to the factual determinations by the masters, who are best able to evaluate the truthfulness of witnesses appearing before them.”). The Supreme Court cited its opinions in Gubler v. Commission on Judicial Performance (1984) 37 Cal.3d 27, 34 [207 Cal.Rptr. 171, 688 P.2d 551] and Wenger v. Commission on Judicial Performance (1981) 29 Cal.3d 615, 623 [175 Cal.Rptr. 420, 630 P.2d 954] (Wenger).

 Broadman, supra, 18 Cal.4th at page 1091.

 The masters explain: “ “It is fundamental that the trial court, however, must refrain from advocacy and remain circumspect in its comments on the evidence, treating litigants and witnesses with appropriate respect and without demonstration of partiality or bias.” ’ (Kloepfer v. Commission on Judicial Performance [(1989)] 49 Cal.3d 826, 845 [264 Cal.Rptr. 100, 782 P.2d 239], quoting People v. Carlucci (1979) 23 Cal.3d 249, 258 [152 Cal.Rptr. 439, 590 P.2d 15].) ‘A trial judge may not . . . in the course of examining witnesses become an advocate for either party or cast aspersions or ridicule upon a witness.’ (McCartney v. Commission on Judicial Qualifications [(1974)] 12 Cal.3d 512, 533 [116 Cal.Rptr. 260, 526 P.2d 268].) The same principle applies to judges who are commenting about a witness’s testimony. While “nothing would prevent the defendant from challenging” ’ a police officer’s evaluation of an HGN test ‘ “with expert testimony of his own . . .” ’ (People v. Joehnk, supra, 35 Cal.App.4th 1488, 1508, quoting Leahy, supra, 8 Cal.4th 587, 611), it is not the judge’s role to be that expert.”

 See Doan, supra, 11 Cal.4th 294, 340, noting that in Geiler, supra, 10 Cal.3d 270, and Gonzalez, supra, 33 Cal.3d 359, the Supreme Court removed judges from office but permitted them to resume the practice of law because the Court did not find moral turpitude, dishonesty, or corruption.

 Broadman, supra, 18 Cal.4th at page 1091.

 Broadman, supra, 18 Cal.4th at page 1092.

 Broadman, supra, 18 Cal.4th at page 1092.

 In Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678, 703 [122 Cal.Rptr. 778, 537 P.2d 898] (Cannon), the Supreme Court held that the judge’s deliberate ridiculing of attorneys constituted willful misconduct in office.

 The masters noted, “[although Mr. Alvear speaks with an accent, we had no difficulty understanding him, even in a hearing room where the acoustics were not particularly good. Christine Meade testified that Alvear’s accent has not changed since the trial. We find that his accent does not make him difficult to understand.”

 Fletcher, supra, 19 Cal.4th at page 914.

 Prejudicial misconduct “does not require the presence of bad faith, but may occur when a judge, though acting in good faith, engages in conduct that adversely would affect the esteem *CJP Supp. 278 in which the judiciary is held by members of the public who become aware of the circumstances of the conduct. [Citations.] The subjective intent or motivation of the judge is not a significant factor in assessing whether prejudicial conduct has occurred under this standard.” (Adams, supra, 10 Cal.4th at p. 878.) In Gonzalez, supra, 33 Cal.3d 359, 376, the Supreme Court considered several ethnic and sexual remarks and held: “Judge Gonzalez’ subjective intent is not at issue. As a judge he is charged with the obligation to conduct himself at all times in a manner that promotes public confidence and esteem for the judiciary.”

 The Masters note the following excerpt from the trial.
“JUDGE VAN VOORHIS: I want to ask you a question, and I have the power to do that. [][] I want to know where you learned in law school, or the District Attorney’s Office, that his probationary status is admissible in a court of law.
“MS. MEADE: I’m sorry, Your Honor. I did not learn that.
“JUDGE VAN VOORHIS: Yeah. And so were you just guessing what you could get away with in a courtroom?
“MS. MEADE: No, Your Honor.
“JUDGE VAN VOORHIS: Then, tell me, on what basis did you ask that question?
“MS. MEADE: On the basis of having a certified copy of the terms—
“JUDGE VAN VOORHIS: But you know and I know that what I agreed you may do is prove the conviction. [SO And you remember me, many times, asking you in what form you intended to prove this conviction, and you never mentioned anything about asking him about probation; did you?
“MS. MEADE: No, Your Honor. HQ ... H]
“JUDGE VAN VOORHIS: You see why I feel a little jilted now?
“MS. MEADE: Yes, Your Honor.
“JUDGE VAN VOORHIS: And then I gave you an opportunity to show me any legal basis that you may have to do it, and you contended there is absolutely none. [][] So now, I want to *CJP Supp. 279 know what your motives are, because they appear to be—to violate my rulings and to break California law in terms of what is permitted in a criminal courtroom, and I’m here to stop you.
“MS. MEADE: I understand that, Your Honor. I have a certified copy of the conviction—
“JUDGE VAN VOORHIS: That’s not what I’m talking about. [][] Shall you focus again on what you did? You asked him about his probationary status; didn’t you?
“MS. MEADE: Yes, Your Honor.
“JUDGE VAN VOORHIS: Well, you know you can’t do that; don’t you?
“MS. MEADE: I do now, Your Honor.
“JUDGE VAN VOORHIS: Didn’t you know it at the time of the question?
“MS. MEADE: No, Your Honor.
“JUDGE VAN VOORHIS: So when I asked at the beginning of this trial how you were going to prove it, you thought I was just making conversation?
“MS. MEADE: No, Your Honor.
“JUDGE VAN VOORHIS: You knew that you were going to be confined to those for [sic] rules of proof because that’s why I was asking the question, to find out what you were going to do; right?
“MS. MEADE: I believed I was confined to the certified copy of the probation terms.
“JUDGE VAN VOORHIS: I made that very clear to you now, and now you have gone off in another direction, without any legal basis whatsoever, and you have made a mistake. I won’t let you do that.”
The masters went on to note that after the above mentioned dialogue, “the court then instructed the jury to disregard the question and proceedings continued”:
“JUDGE VAN VOORHIS: . . . You need to be way more careful in my courtroom than you just were—
“MS. MEADE: Yes, Your Honor.
“JUDGE VAN VOORHIS: —or you could be in a lot of trouble.
“MS. MEADE: Yes, your honor.
“JUDGE VAN VOORHIS: Abide by my rulings or you’ll tangle with me.”

 Kennick, supra, 50 Cal.3d at page 324.

 The transcript from the trial shows the following dialogue.
“MR. GOMES [to Mr. Elze, the witness]: Do you ever go out in public and get drunk?
“MS. BROCK: Objection. Relevance.
“THE WITNESS [Mr. Elze]: For what purpose?
“MR. GOMES: I asked you that question. Please answer it.
“JUDGE VAN VOORHIS: What’s the relevance?
“MR. GOMES: Well, it’s relevant as to the frequency of his drinking.
“THE WITNESS: What purpose? I mean, why should I go out to get drunk?
“JUDGE VAN VOORHIS: You are offering [it] as character evidence?
“MR. GOMES: Okay.
“JUDGE VAN VOORHIS: Are you?
“MR. GOMES: No. No. I’m just—I’ll rephrase the question.
“JUDGE VAN VOORHIS: Uh-huh.
“MR. GOMES [to the witness]: Q. Now, I want you to answer my questions ‘yes’ or ‘no.’
“JUDGE VAN VOORHIS: All right. He’s not really required to do that, and you are really not supposed to prompt him on how you would like him to answer.
“MR. GOMES: I’m just trying to—okay.
“Q. [to the witness]: So do you go out every week and drink?
“MS. BROCK: Objection. Relevance.
“JUDGE VAN VOORHIS: Are you trying to show a habit or custom on his part and then—
“MR. GOMES: Yes.
“JUDGE VAN VOORHIS: —conduct in conformity with that habit?
“MR. GOMES: Yes.
“JUDGE VAN VOORHIS: That’s character evidence. You are offering character evidence?
“THE WITNESS [Mr. Elze]: Are you telling me to answer, your Honor?
“JUDGE VAN VOORHIS: I’m asking him.
“THE WITNESS: Okay.
*CJP Supp. 285 “MR. GOMES: I’ll withdraw that question.
“Q. [to the witness]: Do you drink at home?
“THE WITNESS: Sometimes.
“MR. GOMES: Yeah?
“THE WITNESS: Yeah. When we have dinner, when we stay at home, I have three tenants, and frequently, they will prepare me—one from Afghanistan, and two from the United States and different parts of the country—so we have dinner, and we have something to drink, yes.
“MR. GOMES: How about when you go out?
“THE WITNESS: The same thing.
“MR. GOMES: Do you drink less or more when you go out?
“MS. BROCK: Objection. Relevance.
“THE WITNESS: It depends on the situation.
“JUDGE VAN VOORHIS: What’s the relevance what he does on other occasions?
“MR. GOMES: I think it’s—I think it’s probative, your Honor.
“JUDGE VAN VOORHIS: I know you think that. Otherwise, you wouldn’t be wasting our time. I would just like to have you explain what you’re up to. It sounds to me like it’s character evidence again; isn’t it? [f] You can do that, if you want to.
“MR. GOMES: I’m—I’m certainly just asking questions within the scope, the same questions that she asked.
“JUDGE VAN VOORHIS: Right. You just need to recognize that if what you’re trying to do is show that he has a pattern of behavior, and, therefore, on this occasion, he acted consistent with that behavior, that’s character evidence.
“MR. GOMES: Yeah. I’m not using it to show that.
“JUDGE VAN VOORHIS: Well, that’s exactly what you are doing, aren’t you?
“MR. GOMES: I’m just rehabilitating him.
“JUDGE VAN VOORHIS: That’s exactly what you are doing, and if you want to do that, you are welcome to do that.
“MR. GOMES: Okay.
“JUDGE VAN VOORHIS: Just tell me that’s what you’re doing so she knows, you know, that you are doing that. [][] You have the right to open up that topic or not. It’s already pretty well open; isn’t it?”

 “The judge paused between each ‘isn’t it?’ and ‘tell me,’ waiting for the prosecution to respond.”

 “Curiously, while the judge was looking at Ms. Brock for a response, the proponent of the evidence responded with no, that was not the legal theory for admissibility.”

 “Ms. Brock testified that the judge actually said, ‘Sure. It is. Isn’t it?’ ”

 Deputy Brown told the masters, “I believe I said that she was not transported because her court date had shown to be vacated.” Judge Van Voorhis testified concerning Deputy Brown’s response to Mr. Quandt, “I believe she said either ‘she’ or the person’s name—‘She’s not coming to court.’ She did not use the word[s] ‘going to be transported.’ She said, ‘She’s not coming to court.’ ”

 See Kloepfer v. Commission on Judicial Performance, supra, 49 Cal.3d 826 (Kloepfer) (judge angrily berated a court reporter, reducing her to tears) and McCartney v. Commission on Judicial Qualifications, supra, 12 Cal.3d 512 (McCartney) (judge threatened to hold his clerk in contempt, shouted at her to apologize, discharging the clerk in a violent manner, speaking to an assistant clerk in a loud voice and pounding his fist loudly on her desk).

 The masters explained: “In each instance, the judge violated Canon 1 by failing to observe ‘high standards of conduct... so that the integrity and independence of the judiciary will be preserved.’ The judge violated Canon 2A by failing to act ‘in a manner that promotes *CJP Supp. 293 public confidence in the integrity and impartiality of the judiciary.’ The judge violated Canon 3B(4) by failing to be ‘patient, dignified and courteous’ to persons with whom the judge dealt in an official capacity. In addition, by ignoring a warning from his presiding judge that his conduct should not be repeated, Judge Van Voorhis failed to cooperate with the presiding judge in the administration of court business in violation of Canon 3C(1).”

 Broadman, supra, 18 Cal.4th at pages 1111-1112, citing Adams, supra, 10 Cal.4th 866, 912.

 Furey, supra, 43 Cal.3d 1297, 1320, citing Wenger, supra, 29 Cal.3d at page 654.

 Broadman, supra, 18 Cal.4th at page 1112, citing Furey, supra, 43 Cal.3d at page 1318.

 This is not an exhaustive list of possible considerations and no one consideration should be considered critical to the commission’s determination of the appropriate level of discipline.

 See, for example, Adams, supra, 10 Cal.4th 866 (Judge Adams was removed from office for engaging “in successive extrajudicial transactions that extended over a significant period of time, creating an appearance of serious impropriety and thereby tending to diminish the public esteem of the judiciary—a consequence petitioner either deliberately ignored or was unable to appreciate.” (Id. at p. 914.)); Kloepfer, supra, 49 Cal.3d 826 (Judge Kloepfer was removed for a continuing, pervasive pattern of misconduct—four acts of willful misconduct and 21 acts of prejudicial conduct); and McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186 [260 Cal.Rptr. 557, 776 P.2d 259] (McCullough) (Judge McCullough was removed for committing four acts of willful misconduct and one act of persistent failure to perform his judicial duties and his failure to respond to a prior public censure evidenced a lack of regard for the commission, the court and his obligations as a judge).

 Furey, supra, 43 Cal.3d 1297, 1307, footnote 2.

 Fletcher, supra, 19 Cal.4th at page 918.

 Adams, supra, 10 Cal.4th at pages 912-913.

 Inquiry Concerning Platt (2002) No. 162, Decision and Order Removing Judge Platt from Office [48 Cal.4th CJP Supp. 227]. Platt’s petition to review the commission’s decision was denied on February 19, 2003, by the California Supreme Court.

 See also Kennick, supra, 50 Cal.3d 297. The Supreme Court declined to remove Judge Kennick from office because of misconduct noting that “it seems likely that our public censure of each of petitioner’s misdeeds would have led him to correct and improve his judicial behavior.” (Id. at p. 341.) The court did remove the judge from office for his persistent failure or inability to perform judicial duties.

 Doan, supra, 11 Cal.4th at page 340.

 Inquiry Concerning Platt, supra, No. 162 at page 15 [48 Cal.4th CJP Supp. at page 248].

 See Fletcher, supra, 19 Cal.4th 865; Kloepfer, supra, 49 Cal.3d 826; and Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518 [247 Cal.Rptr. 378, 754 P.2d 724].

 Fletcher, supra, 19 Cal.4th at page 919.

 Fletcher, supra, 19 Cal.4th at pages 920-921.

 Fletcher, supra, 19 Cal.4th at page 921, citing Kloepfer, supra, 49 Cal.3d at page 866.

 Kloepfer, supra, 49 Cal.3d at pages 866-867.

 Inquiry Concerning Platt, supra, No. 162 at page 19 [48 Cal.4th CJP Supp. at page 253].

 Inquiry Concerning Willoughby (2000) No. 154, Decision and Order Imposing Public Censure, page 16 [48 Cal.4th CJP Supp. 145, 165].

 Fletcher, supra, 19 Cal.4th at pages 918 and 921.

 Adams, supra, 10 Cal.4th at page 914.

 The court noted: “Several judges and numerous attorneys testified to their perception of petitioner’s outstanding legal and administrative skills, noting his significant contributions toward streamlining the court system and implementing a ‘fast-track’ system.” (Adams, supra, 10 Cal.4th at p. 911.)

 Justice Mosk wrote: “All that the majority can say in support of removal is that, in their view, Judge Adams’s ‘extrajudicial transactions’ have ‘creatfed] an appearance of serious impropriety’ and have ‘thereby tend[ed] to diminish the public esteem of the judiciary . . . .’ (Maj. opn. ante, at p. 914.) In so many words, they announce that he must be removed because of certain of his acts and omissions off the bench, even though he has in fact properly performed his judicial functions during his long tenure and, as the record shows, has actually increased his community’s confidence in its judges. No reasonable person could agree. I surely cannot.” (Adams, supra, 10 Cal.4th at p. 919 (dis. opn. of Mosk, J.).)

 In re Brown (2001) 464 Mich. 135 [626 N.W.2d 403, 405],

 In re Deming (1987) 108 Wn.2d 82 [736 P.2d 639, 659].

 Rules of the Arizona Commission on Judicial Conduct (eff. Jan. 1, 2002), rule 19 (Mitigating and Aggravating Factors), subsection (d).

 Adams, supra, 10 Cal.4th at pages 911-912.

 Broadman, supra, 18 Cal.4th at page 1112.

 Cannon, supra, 14 Cal.3d at pages 706-707, quoting McCartney, supra, 12 Cal.3d 512, 538.

 Gonzalez, supra, 33 Cal.3d at page 377.

 On the third day of the hearing before the masters, Judge Van Voorhis’s counsel asked him, “Do you acknowledge that you said to Mr. Gardner words to the effect, ‘Where did you learn that in law school?’ ” Judge Van Voorhis’s response was: “I do. It’s, again, something that I regret and that I could say it better now. You know, I should have directed it in connection with having a colorable basis for asking the question, and I should have made that comment outside the presence of the jury.”

 The transcript records the following exchange:
“MS. McMURRAY: If—I wasn’t aware that the Court wouldn’t qualify her, based on her training and the times that she had administered the test, so if you would like me to move on, I am more than—
*CJP Supp. 305 “JUDGE VAN VOORHIS: Many times, she has seen a person demonstrate some sort of symptom. That doesn’t necessarily connect it with alcohol, [f] Probably everybody she has ever arrested has a smaller finger on the end of their hand. That doesn’t mean that everybody with a small finger is drunk.
“MS. McMURRAY: So if this Court is not willing to qualify officers as experts, I will move on.
“JUDGE VAN VOORHIS: That doesn’t really solve the problem completely, because you went down a road that you could not complete, and now this jury has heard about gaze nystagmus, and they are supposed to wonder what it all means.
“MS. McMURRAY: If we could approach the bench, I think that’s probably appropriate.
“JUDGE VAN VOORHIS: And what would you tell me up here?
“MS. McMURRAY: I have questions of the Court.
“JUDGE VAN VOORHIS: Ask me now.”

 The letter concludes with the following paragraph: “I know that another meaning of ‘maturity’ has to do with aging and the ripening of character that comes with the passage of time and the accumulation of experience. Being expected to be almost without imperfections has a way of aging a person. Hopefully, I can make it through the few years of my legal career which remain and make it to retirement in one piece. Thank you for your letter encouraging me to do better.”

 In the following exchange during his appearance before the commission, Judge Van Voorhis admitted he had given the commission an assurance.
“COMMISSION CHAIR (Judge Rise Jones Pichón): Judge Van Voorhis, I have a question. [1] In 1992, you were publicly reproved by the Commission, and in that reproval, Ms. Henley indicated that the Commission determined that a public reproval was adequate discipline for a few reasons, one of which was your assurance that this conduct would not be repeated. [‘ID In this case before the hearing before the special masters, you were asked by Mr. Coyle whether you promised the commission that the conduct which caused the reproval would not be *CJP Supp. 308 repeated. And you said, ‘I can’t tell you what assurance I gave them.’ And you were asked many questions about this, but you never agreed that you made such an assurance. [][] If you were asked this question today, what would your answer be?
“JUDGE VAN VOORHIS: I gave that testimony under oath, and I was in no position to tell you with 100 percent certainty what happened.
“COMMISSION CHAIR: But you can tell us today—
“JUDGE VAN VOORHIS: If you will notice that—
“COMMISSION CHAIR: But can you tell us today what your assurance was?
“JUDGE VAN VOORHIS: Since the testimony, I have researched and I did give such an assurance. And I’m able now to say with 100 percent certainty, yes, I did. But at the time, I was not able to give that testimony.”

 It might be noted that Judge Van Voorhis’s response brief to the commission states, “Judge Van Voorhis has been working to control his demeanor and was successful for approximately eight years.”

 In Ms oral presentation to the commission Judge Van VoorMs spoke of handling 64 jury trials in the last 18 months and opined that he “handled things better,” but there is notiiing in the record to support these representations.

 Judge Van VoorMs stated: “In your evaluation of me, I’m worried about being misjudged. I’m not like you. If I seem completely different than you are, would that by itself make you dislike me? It sounds silly doesn’t it? Being different can ignite a special tension if you let it. Conformity feels secure, so most people are naturally attracted to being part of the group, to blending in. And it’s easier to understand and communicate with someone who sounds like you, so we’re comfortable with people from our own group. [][] But differences between people shouldn’t bother anyone. People from different parts of the world with different patterns of speech and ways of tMnMng shouldn’t be poorly treated because they’re different. Ethrnc bias is unjustifiable. [][] Isn’t the phenomenon a ridiculous paranoia that we should all try to eliminate. Please nod with me.”

 Judge Van Voorhis engaged in the following dialogue.
“COMMISSIONER KAHN: Following your logic, so long as you have a good purpose in mind, do you think that you can behave in any way that you feel is appropriate under the circumstances and you have immunity from removal so long as you’re acting with good purpose?
“JUDGE VAN VOORHIS: The Supreme Court has not decided whether reckless disregard of a judge’s duty would constitute bad faith.
“COMMISSIONER KAHN: So in other words, you think that you can make as many demeanor mistakes as can happen and there’s no limit to the number of demeanor mistakes you make, and you can’t be removed because they were just done with the good purpose? Is that your position?
“JUDGE VAN VOORHIS: Are you asking if it’s my position legally or are you asking me my own personal opinion?
“COMMISSIONER KAHN: As I understood it, you were suggesting that removal was inappropriate. And I’m asking you whether you think you are immune from removal regardless of how many mistakes you make so long as those mistakes are made in good faith.
“JUDGE VAN VOORHIS: Without bad faith, a judge cannot be removed from office for demeanor purposes. That is the legal position that I asked my advocate to take. I have not ever stated what I think personally, and I don’t think it’s appropriate for me to do that.”

 In Cannon, supra, 14 Cal.3d at page 706, the Supreme Court noted: “It is manifest in any event that a lack in the quality of justice cannot be balanced by the fact that justice, such as it is, is administered in large quantities.”

 One attorney testified that he once had a case in which he thought the jury was “swinging away” from him because of the interaction Judge Van Voorhis was having with the prosecutor. Another lawyer testified that if an attorney was not prepared, Judge Van Voorhis would call the attorney on it and scold the attorney.

 Justice Simons (the presiding judge in 1999) testified that he used Judge Van Voorhis less and less in Martinez as time went on because “the benefits began to be outweighed by the problem-solving [that] was required after he helped out.”

 Article VI, section 18, subdivision (d) of the California Constitution states that the commission may “censure a judge or former judge or remove a judge for action occurring not more than 6 years prior to the commencement of the judge’s current term or of the former judge’s last term that constitutes willful misconduct in office, persistent failure or inability to perform the judge’s duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.”

 Geiler, supra, 10 Cal.3d at page 284, footnote 11.

 McCullough, supra, 49 Cal.3d at page 191.

 Wenger, supra, 29 Cal.3d at page 653.

 Wenger, supra, 29 Cal.3d at page 654.

 Wenger, supra, 29 Cal.3d at page 654, citing McComb v. Commission on Judicial Performance (1977) 19 Cal.3d Spec. Trib. Supp. 1, 9 [138 Cal.Rptr. 459, 564 P.2d 1],

 Fletcher, supra, 19 Cal.4th at page 921 (original brackets), quoting Kloepfer, supra, 49 Cal.3d at page 866.

 In Getter, supra, 10 Cal.3d at page 287 the Supreme Court noted that the judge’s “removal from office is required more by the high standards of judicial office than by his personal failings.”

 See Gonzalez, supra, 33 Cal.3d at page 378. (“Because we do not find that Judge Gonzalez’ misconduct rises to the level of moral turpitude, dishonesty, or corruption, we order that despite his removal from office he be permitted to practice law in California, on condition that he pass the Professional Responsibility Examination required of applicants seeking readmission or reinstatement to the bar.”) Also Geiler, supra, 10 Cal.3d at page 287. (“Much evidence was adduced before the Commission of petitioner’s diligence in the work of the law, and his unjudicial conduct cannot be said to amount to moral turpitude, dishonesty or corruption.”)

 Fletcher, supra, 19 Cal.4th at page 921, quoting Kloepfer, supra, 49 Cal.3d at page 866, footnote omitted, original italics.

 1 note, however, defense counsel observed he did not believe that Judge Van Voorhis raised his voice or was harsh or discourteous, contrary to the deputy district attorney’s observation of a “smirk” on respondent’s face. The masters “independently reviewed the transcript” and sided with the deputy district attorney. Regrettably, an independent review of a written record cannot discern smirks or vocal intonations. Nevertheless, for purposes of this dissent, I accept the masters’ finding.

 The judge appears to have been wrong in his rulings on the test. It is difficult to disregard this legal error in assessing his conduct. However, for purposes of my analysis, I have assumed that his ruling was correct, in which case his righteous indignation with the prosecutor’s response to his rulings may have been warranted. Nonetheless, respondent was still under an obligation to act courteously and to treat the participants with dignity and respect. He did neither.

 The allegations against respondent are unlike another angry judicial outburst examined in Kennick where the judge verbally abused an attorney and later joked about the deed, suggesting the episode was instigated, in whole or part, for the judge’s amusement.

 Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518, 545 [247 Cal.Rptr. 378, 754 P.2d 724],

 Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams).

 Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239] (Kloepfer).

 Spruance v. Commission on Judicial Qualifications (1975) 13 Cal.3d 778 [119 Cal.Rptr. 841, 532 P.2d 1209] (Spruance); Gonzalez v. Commission on Judicial Performance (1983) 33 Cal.Sd 359 [188 Cal.Rptr. 880, 657 P.2d 372],

 Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958] (Fletcher).

 Kennick, supra, 50 Cal.3d 297.

 Adams, supra, 10 Cal.4th 866.

 Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678 [122 Cal.Rptr. 778, 537 P.2d 898] (Cannon); Wenger v. Commission on Judicial Performance (1981) 29 Cal.3d 615 [175 Cal.Rptr. 420, 630 P.2d 954],

 McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186 [260 Cal.Rptr. 557, 776 P.2d 259].

 Fletcher, supra, 19 Cal.4th 865.

 The majority decision appears to treat respondent’s reference to his difficulty as a “demeanor problem” as an effort to minimize the seriousness of his conduct. My use of the term is not so intended; it is a convenient shorthand description of the various allegations at issue in this proceeding.

 Fletcher, supra, 19 Cal.4th at page 880.

 Kennick, supra, 50 Cal.3d at pages 322-324.

 Kennick, supra, 50 Cal.3d at page 339.

 The court ultimately upheld the removal recommendation but based “on the sole ground of persistent failure or inability to perform his judicial duties.” (Kennick, supra, 50 Cal.3d at pp. 342-343.)

 Kloepfer, supra, 49 Cal.3d at pages 839, 861.

 Roberts, supra, 33 Cal.3d at pages 743-745.

 Roberts, supra, 33 Cal.3d at page 745.

 Stevens, supra, 31 Cal.3d at page 404.

 Dodds, supra, 12 Cal.4th at page 178.

 Regrettably, we are without the authority conferred on judicial commissions in other states to impose discipline greater than reprimand or censure but less than removal. Suspension and training might be appropriate in this matter.